726 A.2d 955 (1999)
320 N.J. Super. 34
Joseph STAUB and Dorothy Staub, Plaintiffs-Appellants,
v.
EASTMAN KODAK COMPANY, Alcon Pharmaceutical Laboratories, Inc., Alcon (Puerto Rico), Inc., Lafayette Pharmaceutical, Inc., and Lafayette Pharmacal, Inc., Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued December 1, 1998.
Decided April 5, 1999.
*956 Wayne D. Greenstone, Newark, for plaintiffs-appellants (Greenstone & Greenstone, attorneys; Mr. Greenstone, on the brief).
Thomas J. Alworth and George A. Joseph, of the Chicago bar, admitted pro hac vice for Kirkland & Ellis, Chicago, IL, for defendants-respondents (Shanley & Fisher, attorneys, Morristown, and Kirkland & Ellis, attorneys; Mr. Alworth, Mr. Joseph, and Ellen Therese Ahern, Chicago, IL, on the brief).
Before Judges PRESSLER, BROCHIN and STEINBERG.
The opinion of the court was delivered by BROCHIN, J.A.D.
Plaintiffs Joseph Staub and Dorothy Staub, his wife, allege that Mr. Staub suffers from arachnoiditis, a debilitatingly painful inflammation of the membrane surrounding the spinal cord. He claims to have developed this condition as the result of having been injected with Pantopaque, a radiopaque substance used as a contrast medium for myelography, a process for the x-ray visualization of the spinal cord. Defendants manufactured or distributed Pantopaque. Mr. Staub seeks damages from defendants as compensation for his condition because he alleges Pantopaque is a defective product. Although his complaint pleads failure to warn, defective manufacturing and defective design, his appellate brief suggests that he is relying exclusively on his contention that defendants failed to warn that Pantopaque could cause arachnoiditis.[1] *957 Mr. Staub was injected with Pantopaque on four occasions, in March 1972, March 1978, September 1979, and December 1981. He commenced this action on March 31, 1994. Claiming that Mr. Staub knew or should have known long before March 31, 1992, of the facts on which he bases his cause of action, defendants moved for summary judgment dismissing his complaint on the ground that his suit was barred by the twoyear statute of limitations, N.J.S.A. 2A:14-2.[2]
Mr. Staub advanced the same arguments in opposition to the summary judgment motion that he has asserted before us. He contends that his cause of action did not accrue until he knew that his condition was attributable to the fault of another, and that he acquired that knowledge for the first time on September 9, 1993, when Dr. John J. Sweeney, a Department of Veterans' Affairs physician who had been treating him since some time before March 25, 1992, wrote in a letter addressed "To Whom it may Concern" that Mr. Staub "is presently under my care and being treated for arachnoiditis which has been confirmed by MRI." Alternatively, Mr. Staub asserts that the period of limitations for commencing his suit was tolled by the filing of a putative class action in the United States District Court for the District of New Jersey on August 28, 1990 on behalf of two classes of potential plaintiffs, "All persons in the United States who received one or more Pantopaque myelograms and subsequently [(1) ] have been diagnosed with Arachnoiditis [or (2) who have] symptoms of arachnoiditis [and] ... to date[ ] have not been diagnosed with arachnoiditis," and that the tolling continued until the district court denied class certification on August 28, 1992. We will consider each of these arguments in turn.
Mr. Staub has suffered from back pain at least since 1971, when he injured his back, right leg, and shoulder as the result of a fall from a ladder. Since that time, his pain has become steadily more severe and debilitating. Following a further injury resulting from an accident which he sustained on July 20, 1979 while operating a tractor at a construction site, he experienced acute pain in his back, right leg and right knee, numbness and tingling in his right leg, pain radiating down both legs and severe and extensive emotional and neurological injuries. He has not been able to work since that accident. Lumbar spine surgery on four occasions, most recently in December 1979, failed to alleviate his condition.
On June 21, 1990, the "Geraldo" show on television dealt with "Time-bomb Drugs." Pantopaque was one of the three drugs which were the subject of the program. Ms. Staub watched the entire program. Mr. Staub watched at least parts of it. Two of the guests who appeared on the show claimed to be suffering from arachnoiditis that had resulted from injections of Pantopaque. One of the guests said that the Pantopaque which caused her injury had been administered to her in connection with a myelogram. The host of the program mentioned Alcon Labs as the manufacturer of Pantopaque, explained that Pantopaque is "like a dye ... that they inject into your spine so they can take an X-ray or a picture of your spine for suspected injury," and he introduced an attorney who, he said, was "handling many of these Pantopaque cases." Both of the arachnoiditis sufferers on the program described symptoms which were the same as Mr. Staub's. Toward the end of the show, the host gave the address of one of the guests who would "serv[e] as the clearinghouse for... inquiries" from "people who are alleging some after effects or side effects or suspecting some from the drug Pantopaque," and he summarized comments about the apparent connection between Pantopaque and the back and leg pains which the guests described:
So, if any of you have had a myelogram, then you've had, probably, the Pantopaque. So, if you have the symptoms that have been described here ... just remember that. If you have some unexplained symptoms, this may be one of the reasons.
*958 Mr. and Mrs. Staub discussed the program after it had concluded. She said to her husband, "We found out why you can't go back to work." He testified that he came to an "understanding of what arachnoiditis can do to people" by "catching the end, really, of the `Geraldo' show."
Mr. Staub wrote to the "clearinghouse" address provided on the "Geraldo" show. His brief to our court states, "Mr. Staub wrote to the Arachnoiditis Information Support Network for information, which was sent at some time during 1990, although it is unclear precisely when any of this information was received." He testified that he received the materials from the Arachnoiditis Foundation when his wife wrote for them after the "Geraldo" show. He learned the names of the manufacturers of Pantopaque either from these materials or from someone associated with the Arachnoiditis Foundation.
On August 28, 1990, a putative class action seeking damages and other relief was filed in the United States District Court for the District of New Jersey against the same parties who are defendants in the present suit. We have not been furnished with a copy of the complaint in that suit, but the District Court's opinion denying class certification indicates that the theory of the case was that Pantopaque was a defective product which had caused persons using it to develop arachnoiditis. Mr. Staub learned of the class action from information which he received from the Arachnoiditis Foundation. He claims to have signed a retention letter retaining the attorneys representing plaintiffs in the class action. The record submitted to us does not show the date of the retention letter. But Mr. Staub testified that "for two years I kept getting letters.... Some kind of update letters on the class action suit." Most of the two year period in which those "update letters" were sent must have preceded the denial of class certification on August 28, 1992.
On April 30, 1991, Mr. Staub consulted with a Dr. Robert Dengrove. The doctor's handwritten notes record that Mr. Staub told him about having a number of myelograms and that "ever since the 1stwonders ARACHNOIDITIS." Dr. Dengrove saw Mr. Staub again on August 26, 1991, one month after he had undergone an MRI[3] procedure. The doctor's notes of that visit state, "He's c/o [complaining of] `Arachnoiditis'" and that Mr. Staub told him "my [attorneys] are suing Pantopaque for the myelograms." Since the present suit was not commenced until March 31, 1994, Mr. Staub was presumably referring to the class action suit in the United States District Court.
Mr. Staub's appellate brief describes his relation to the class action suit as follows:
After receiving some information from the Geraldo Show and the arachnoiditis support group, Mr. Staub was informed of a pending class action and contacted those attorneys. He retained them to represent his interests in the action against these defendants. When a motion for class certification was denied, Mr. Staub sought counsel to protect his individual rights.
His appellate reply brief adds:
[T]he Staubs acted prematurely in contacting the class action attorneys after watching the television show and getting information from the arachnoiditis support group, before his condition was even diagnosed and a doctor rendered his opinion as to possible causation. The Staubs had joined the class action upon their suspicions that he may have been suffering from a condition as yet undiagnosed. Their contacting the class action attorneys was just the next step suggested in the newsletter they received from the support group, suffering from chronic, interminable pain, the class action provided some measure of emotional relief.
During Mr. Staub's deposition, he was asked the following questions and gave the following replies about his institution of the present law suit:
Q. Why did you bring this lawsuit?
A. Because I seen [sic] something that that says that Kodak is responsible for the pain that I have now.
Q. What did you see that indicated to you [that] you thought Kodak was responsible for your pain?
*959 A. Well, at first I heard of a number that I could call.
Q. Where did you hear of that number?
A. Geraldo show. And I called that number.
Q. Do you know what that number was for?
A. It was for literature
Q. What kind of literature?
A. back literature, for pain that they described almost identical to the pain that I had.
On the basis of this record, the motion judge explained his grant of summary judgment as follows:
This poor gentleman had a very [long] tortured history with regard to his spine. But I find that the events in the spring of `91 watching this show and learning of this condition being discussed on the GERALDO show which apparently took place in June ... `90.... And, then receiving information shortly thereafter from a, someone who is called a support group which set forththis is the spring of `91 sets forth a definition of arachnoiditis and talked about scarred tissue, adhesions, nerve root entrapment. Set forth the fact that there are other people suffering from this. That the GERALDO show named some of the defendants that are sought here, that apparently Mr. Staub had an M.R.I. in July of 1991. That this M.R.I. showed nerve clumping at L4, L5. That he discussed this with Doctor Dengrove who made a note in his chart about arachnoiditis.
I find that all of these facts indicate that some time in the summer of `91 ... that this cause of action arose [at least by] the summer of `91 and there should have been a complaint filed within two years of that summer of `91.
During the hearing before the Law Division on the summary judgment motion, the motion judge paraphrased Mr. Staub's argument by saying, "So, your position is, he's got to be told by a medical professional that you have arachnoiditis and that the cause of it was the dye used in the myelogram." Plaintiff's attorney agreed to the accuracy of the paraphrase, and he makes essentially the same argument on appeal, contending that his argument is supported by the "discovery rule" elucidated in Lopez v. Swyer, 62 N.J. 267, 300 A.2d 563 (1973). We disagree.
The "discovery rule" "is an equitable principle by which the accrual of a cause of action is delayed `until the injured party discovers, or by the exercise of reasonable diligence and intelligence should have discovered[,] that he may have a basis for an actionable claim.'" Vispisiano v. Ashland Chemical Co., 107 N.J. 416, 419, 527 A.2d 66 (1987) (quoting Viviano v. CBS, Inc., 101 N.J. 538, 546, 503 A.2d 296 (1986)).
The critical questions for application of the discovery rule in a personal injury case are: Did the injured party discover more than two years before he filed his complaint that he might have a basis for an actionable claim? By the exercise of reasonable diligence and intelligence, should he have discovered more than two years before he filed his complaint that he might have a basis for an actionable claim? In some cases, the facts demonstrate plainly that the plaintiff must, or should, have concluded before the critical date that he was injured and that his injury was probably someone else's fault. See e.g., Burd v. New Jersey Tel. Co., 76 N.J. 284, 292-93, 386 A.2d 1310 (1978). In other cases, the facts show that the plaintiff did not know, and did not have sufficient reason to know, that his misfortune was another's fault until some date long after his injury. See e.g., Lopez v. Swyer, supra, 62 N.J. at 272-73, 300 A.2d 563. Sometimes the facts have been equivocal. For example, in Graves v. Church & Dwight Co., 115 N.J. 256, 257-60, 558 A.2d 463 (1989) (O'Hern, J., concurring), the controlling question was whether a person whose stomach was torn by a gas explosion after taking bicarbonate of soda for an upset stomach was tardy in surmising the causal relation between his injury and his ingestion of the product. The Court was divided equally about when the plaintiff knew, or should have known, the causal connection with sufficient certainty to warrant his pursuing a failure-to-warn claim against the manufacturer.
*960 Savage v. Old Bridge-Sayreville Medical Group, 134 N.J. 241, 633 A.2d 514 (1993), and Apgar v. Lederle Laboratories, 123 N.J. 450, 588 A.2d 380 (1991), are two cases which involve similar facts but led to different results. The plaintiff in each case claimed damages for tooth discoloration which she alleged had resulted from the administration of tetracycline antibiotics for childhood infections.
In Apgar, the Supreme Court held that the case was barred by the statute of limitations because the plaintiff, on adequate information, believed that her injury had resulted from the fault of the manufacturer. But in Savage, the Court reversed the grant of summary judgment and remanded for a factual hearing because it found there was a fact question whether the plaintiff knew enough to cause a reasonable person to believe that the manufacturer was at fault. The differences between the two cases help to clarify what knowledge is necessary to start the running of the statute of limitations.
Kelly Anne, the plaintiff in Apgar, was told by her dentist when she was still in junior high school that medicine she had taken as an infant had cause the discoloration of her teeth. While she was still in her teens, she visited the Johnson & Johnson Dental Clinic for an evaluation. There she learned that her tooth discoloration had been caused by medication and that the damage was permanent. Before she was eighteen years old, she believed that the manufacturer either knew and failed to disclose that the drug caused discoloration or that its testing had been inadequate. The Court held that the period of limitations began to run against the plaintiff's claim as soon as she became an adult. The Court explained its holding as follows:
In this case Ms. Apgar knew by the time she had reached her twenty-first birthday that her teeth had been discolored and, based on information from several dentists, that medication she had taken as a child had produced the staining. No one gave her a contrary opinion. Her own belief was that the medicine she had ingested as a child had caused the condition. She was therefore aware of a "state of facts which may equate in law with a cause of action." Burd, supra, 76 N.J. at 291, 386 A.2d 1310 [remainder of citation omitted]. On that view of the case the statute of limitations expired ... two years after plaintiff's twenty-first birthday.

[123 N.J. at 455, 588 A.2d 380.]
Suzanne Savage was the plaintiff in Savage v. Old Bridge-Sayreville Medical Group, supra. When she was nine or ten years old, her mother told her that discoloration of her teeth may have been the result of taking medicine as a child. 134 N.J. at 245, 633 A.2d 514. Throughout her teens and into her twenties, she understood the correlation between the discoloration of her teeth and her childhood medications. She claimed, however, that it was not until her mother read a 1988 advertisement for legal actions for tetracycline staining that she was aware she had a claim. Ibid. Affirming our court's reversal of a summary judgment that would have barred Ms. Savage's claims on statute of limitations grounds, the Court asked,
Can one reasonably assume that Suzanne would have been, as a child, aware of either a defect in the tetracycline products or of a lack of due diligence among the physicians who had treated her? At what later point in her maturing would it have been reasonable to believe that she should have been aware of a defect in the product or the treatment?

[Id. at 246, 633 A.2d 514 (emphasis added).]
The Court ordered a remand to determine "when Suzanne Savage was aware of or should have been aware of the facts that would suggest to a reasonable person exercising ordinary diligence that the conduct of a third party may have caused her injurious condition and that the conduct was possibly lacking in due care." Id. at 250, 633 A.2d 514.
In Gallagher v. Burdette-Tomlin Medical Hosp., 318 N.J.Super. 485, 495-96, 723 A.2d 1256 (1999), another panel of this court inferred the following rule from the decided cases:
[T]he cases turn not wholly upon what records or documents are in a plaintiff's possession, but upon what a reasonable *961 person would make of that material.... In each case, the applicability of the discovery rule turned upon whether a reasonable person would have known, based on what occurred and on the records, that his or her injury was due to the fault of another.
In our view, that is the test which is applicable to the present case.
Discovering that one might have a basis for an actionable claim means perceiving an injury and believing, or having reason to believewith a degree of firmness that would lead a reasonable person to investigate the matter if he is interested in seeking redressthat his injury was probably caused by the fault of another. Certainty is not required. "[K]nowledge of fault does not mean knowledge of a basis for legal liability or a provable cause of action; knowledge of fault denotes only facts suggesting the possibility of wrongdoing." Savage, supra, 134 N.J. at 248, 633 A.2d 514. After discovering that he might have a claim for damages for personal injuries, a potential plaintiff still has two years within which to complete his investigation, to decide whether the proofs available to him warrant suit, and to file his action. But if he does not file suit within that time, his action is barred by the applicable statute of limitations.
The facts of the present case leave no doubt that Mr. Staub knew that he was suffering from an injury and that, more than two years before commencing suit, i.e., before March 31, 1992, he surmisedwith the degree of firmness that would have led a reasonable person to investigate the matter if he was interested in seeking redressthat his injury was probably caused by the injection of defendants' Pantopaque. In fact, he did investigate, but his investigation did not lead him to commence his individual suit against the manufacturers and distributors of Pantopaque until more than two years after the discovery which triggered the running of the statute of limitations.
Mr. Staub's request for information and his receipt of it from the Arachnoiditis Foundation in 1990 as the result of his and Ms. Staub's viewing the "Time-bomb Drugs" program on the "Geraldo" show demonstrate that that program started him on the path to a lawsuit. Mr. Staub himself testified that what he had heard on the "Geraldo" show prompted him to file suit. Cf. Maestas v. Sofamor Danek Group, Inc., No. 02A01-9804-CV-00099, 1999 WL 74212, at *4 (Tenn. Ct.App. Feb. 16, 1999) (statute of limitations could not continue to be tolled after the airing of a show on the television program "20/20" about pedicle screws, a device used in spinal fusion operations). More than that, he actually retained the attorneys who represented the plaintiffs in the Pantopaque class action in federal court, and he received regular "updates" about the progress of that suit during a two-year period from the inception of that suit on August 20, 1990 until the denial of class certification on August 28, 1992. Even without evidence of Mr. Staub's having viewed the "Geraldo" program and acted on what he learned from it, the fact that he retained the plaintiffs' Pantopaque class action lawyers and received regular information about the progress of their suit more than two years before commencing the present action is incontrovertible evidence that the discovery rule did not preserve his claim.
We turn next to plaintiffs' argument that their claim against the manufacturers and distributors of Pantopaque was tolled from August 28, 1990, when the Pantopaque class action complaint was filed in the United States District Court for the District of New Jersey, until August 28, 1992, when the motion for certification of two plaintiffs' classes was denied. This argument is based on American Pipe & Construction Co. v. Utah, 414 U.S. 538, 94 S.Ct. 756, 38 L. Ed.2d 713 (1974) (hereinafter "American Pipe") and Crown, Cork & Seal Co. v. Parker, 462 U.S. 345, 103 S.Ct. 2392, 76 L. Ed.2d 628 (1983). Both of those cases hold that a statute of limitations that would bar a claim may be tolled during the pendency of a putative class action asserting substantially the same claim.
In American Pipe, more than sixty municipalities, and water districts in the State of Utah moved to intervene in a Sherman Act treble damage action after an order had been entered ruling that the case, instituted by the *962 State of Utah, could not proceed as a class action because the number of potential claimants damaged by the alleged antitrust violations was insufficient. See Fed.R.Civ.P. 23. All of the would-be intervenors had been designated as members of the putative class. Their motion to intervene was denied on the ground that the applicable statute of limitations had run and that it had not been tolled by the institution of the class action on their behalf. The Ninth Circuit Court of Appeals reversed, holding that "`as to members of the class Utah purported to represent, and whose claims it tendered to the court, suit was actually commenced by Utah's filing.'" 414 U.S. at 545, 94 S.Ct. at 762, 38 L. Ed.2d at 722. The Supreme Court agreed, holding that
at least where class action status has been denied solely because of failure to demonstrate that "the class is so numerous that joinder of all members is impracticable," the commencement of the original class suit tolls the running of the statute for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status.
[414 U.S. at 552-53, 94 S.Ct. at 766, 38 L. Ed.2d at 726.]
The court explained the rationale of its holding as follows:
[S]tatutory limitations periods are "designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitations and that the right to be free of stale claims in time comes to prevail over the right to prosecute them." [Citation omitted.] The policies of ensuring essential fairness to defendants and of barring a plaintiff who "has slept on his rights" ... are satisfied when, as here, a named plaintiff who is found to be representative of a class commences a suit and thereby notifies the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment. Within the period set by the statute of limitations, the defendants have the essential information necessary to determine both the subject matter and size of the prospective litigation, whether the actual trial is conducted in the form of a class action, as a joint suit, or as a principal suit with additional interveners.
[414 U.S. at 554-55, 94 S.Ct. at 766-67, 38 L. Ed.2d at 727.]
Crown, Cork & Seal Co. v. Parker, supra, extended the rule of American Pipe. In Crown, Cork & Seal Co., Parker, an African-American employee of the defendant company, claimed that his firing by his employer constituted discrimination against him because of his race in violation of Title VII of the Civil Rights Act. He filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). The Commission issued a determination letter finding no reasonable cause to believe his charge was true, and it sent him a statutory notice that he had the right to institute his own suit provided that it was commenced within ninety days. Parker did not file suit within that ninety days. He waited almost two years. But two other African-American employees of Crown, Cork & Seal Company commenced a putative class action while Parker's charge was pending before the EEOC. They alleged that the company had discriminated against its black employees with respect to hiring, discharges, job assignments, promotions, disciplinary actions and other terms and conditions of employment in violation of Title VII, 42 U.S.C.A. §§ 2000e to 2000e-17. Their putative class action purported to have been filed on behalf of a class of "black persons who have been, continue to be and who in the future will be denied equal employment opportunities by defendant [their employer] on the grounds of race or color." 462 U.S. at 347, 103 S.Ct. at 2394, 76 L. Ed.2d at 632. Class certification was denied because "the named plaintiffs' claims were not typical of those of the class, ... the named plaintiffs would not be adequate representatives, and... the class was not so numerous as to make joinder impracticable." Id. at 347-48, 103 S.Ct. at 2394, 76 L. Ed.2d at 632. When *963 Crown, Cork & Seal Company moved to dismiss Parker's suit on the ground that it had not been filed within time, he resisted on the ground that the ninety-day period of limitations was tolled between the filing of the class action and the denial of class certification. The Supreme Court agreed.
The Court rejected the defendant's argument that the rule of American Pipe tolled the period of limitations only in favor of would-be interveners in the putative class action. It held that the "filing of a class action tolls the statute of limitations `as to all asserted members of the class'...." Id. at 350, 103 S.Ct. at 2396, 76 L. Ed.2d at 633. The Court reasoned, as it had in American Pipe, that class members should be able to rely on the existence of the suit to protect their rights and should not be compelled to intervene or commence their own suits to protect themselves before a court in which a putative class action was pending could decide whether it should proceed as a class action. Otherwise, the Court concluded, "The result would be a needless multiplicity of actionsprecisely the situation that [the federal class action rule] and the tolling rule of American Pipe were designed to avoid." Id. at 351, 103 S.Ct. at 2396, 76 L. Ed.2d at 634.
The Crown, Cork & Seal Co. opinion reiterates that this tolling rule is consistent with the purposes of statutes of limitations, to put defendants on notice of adverse claims and to prevent plaintiffs from sleeping on their rights, because "[c]lass members who do not file suit while the class action is pending cannot be accused of sleeping on their rights," and the class action rule "both permits and encourages class members to rely on the named plaintiffs to press their claims." Id. at 352-53, 103 S.Ct. at 2397, 76 L. Ed.2d at 635. Furthermore, the Court noted, a class complaint provides notice of both the substantive claims and the "the number and generic identities" of the potential claimants. Significantly for the present case, the description of the asserted class on which Parker was held entitled to rely"black persons who have been, continue to be and who in the future will be denied equal employment opportunities by defendant on the grounds of race or color"is much more amorphous than the class asserted in American Pipe.
Most state courts that have considered the issue have held that the pendency of a putative class action which does not achieve class action status tolls the applicable statute of limitations for the benefit of any individual claimant who would have been a class member if the class had been certified. See First Baptist Church v. Citronelle-Mobile Gathering, Inc., 409 So.2d 727, 728-29 (Ala.1981) (fraud and breach of contract); Nolan v. Sea Airmotive, Inc., 627 P.2d 1035, 1041-42 (Alaska 1981) (wage and hour claim); Blaylock v. Shearson Lehman Bros., 330 Ark. 620, 954 S.W.2d 939, 941 (1997) (securities fraud); San Francisco Unified Sch. Dist. v. W.R. Grace & Co., 37 Cal.App.4th 1318, 44 Cal.Rptr.2d 305, 317-18 (1995) (asbestos removal); Becker v. McMillin Constr. Co., 226 Cal.App.3d 1493, 277 Cal.Rptr. 491, 496 (1991) (homeowner's suit against mass builder for shoddy construction); Rosenthal v. Dean Witter Reynolds, Inc., 883 P.2d 522, 531 (Colo.Ct.App.1994) (state securities law violations), aff'd in part, rev'd in part, 908 P.2d 1095 (Colo.1995); Grimes v. Housing Auth. of New Haven, 242 Conn. 236, 698 A.2d 302, 306 (1997) (personal injury); Levi v. University of Hawaii, 67 Haw. 90, 679 P.2d 129, 131-32 (1984) (challenge to retirement policy); Steinberg v. Chicago Medical Sch., 69 Ill.2d 320, 13 Ill.Dec. 699, 371 N.E.2d 634, 645 (1977) (breach of contract by private medical school); Hess v. I.R.E. Real Estate Income Fund, Ltd., 255 Ill.App. 3d 790, 195 Ill.Dec. 935, 629 N.E.2d 520, 531 (1993) (securities law violations), reh'g denied, 152 Ill.2d 559, 190 Ill.Dec. 889, 622 N.E.2d 1206 (1993); Waltrip v. Sidwell Corp., 234 Kan. 1059, 678 P.2d 128, 132 (1984) (claim to interests in gas and oil leases); Northview Constr. Co. v. City of St. Clair Shores, 395 Mich. 497, 236 N.W.2d 396, 406 n. 11 (1975) (recovery of excess building fees); Carlson v. Independent Sch. Dist. No. 283, 370 N.W.2d 51, 55 (Minn.Ct.App.1985) (discrimination against female teachers), aff'd in part, rev'd in part, 392 N.W.2d 216 (Minn.1986); Columbus Bd. of Educ. v. Armstrong World Indus., 89 Ohio App.3d 846, 627 N.E.2d 1033, 1040 (1993) (rule recognized but not as against party added to class action after expiration of period *964 of limitation), motion to certify denied, 68 Ohio St.3d 1427, 624 N.E.2d 1064 (1994); Municipal Auth. v. Moffat, 670 A.2d 747, 749 (Pa.Commw.Ct.1996) (giardiasis infection from municipal water supply); Maestas v. Sofamor Danek Group, Inc., supra, 1999 WL 74212, at *5 (personal injury from product not fit for its intended purpose); Bara v. Major Funding Corp. Liquidating Trust, 876 S.W.2d 469, 472-73 (Tex.Ct.App. 1994) (consumer fraud); American Tierra Corp. v. City of West Jordan, 840 P.2d 757, 761-62 (Utah 1992) (subdividers' suit against city seeking return of land and/or fees assessed pursuant to invalid ordinance). It should be noted, however, that with the possible exception of Municipal Auth. v. Moffat, supra, in which the plaintiff claimed that she had become infected by a parasite, giardiasis, as the result of using municipal water, and Maestas v. Sofamor Danek Group, Inc., supra, which involved plaintiffs who were injured by spinal fixation devices implanted into their spines, all of these cases, including the tort suits, sought tolling on the basis of class actions which asserted a class whose members were known or readily ascertainable. See e.g., Becker v. McMillin Construction Co., supra, 226 Cal.App.3d 1493, 277 Cal.Rptr. 491 (1991) (all homeowners in a residential development); Grimes v. Housing Authority of the City of New Haven, supra, 242 Conn. 236, 698 A.2d 302 (1997) (all residents of a housing project).
Several cases which have considered the applicability of the American Pipe tolling rule to products liability or mass tort cases have ruled against tolling. In Jolly v. Eli Lilly & Co., 44 Cal.3d 1103, 245 Cal.Rptr. 658, 751 P.2d 923 (1988), the California Supreme Court refused to toll a personal injury statute of limitations on the basis of a putative class action which asserted claims on behalf of a woman injured by her mother's ingestion of DES during pregnancy. The court reasoned that claims of injury resulting from defective drugs require individual proof of the medical care supplied, the dosage administered, the patient's physical condition, the time of ingestion, etc. Consequently, the court wrote, class actions asserting such claims are very unlikely to be certified, a potential plaintiff is therefore unjustified in withholding his own suit in reliance on such a class action, and the filing of such a putative class action does not provide the defendant with reasonable notice of the outstanding claims. See also Portwood v. Ford Motor Co., 183 Ill.2d 459, 233 Ill.Dec. 828, 701 N.E.2d 1102, 1103-04 (1998) (declining to toll a state statute of limitations on the basis of a federal class action in an action by automobile owners against manufacturer for breach of contract); Barela v. Denko K.K., No Civ.93-1469LH/RLP, 1996 WL 316544, at *4 (D.N.M. Feb.28, 1996) (same, predicting New Mexico law in case where plaintiff became ill after taking L-tryptophan); Bell v. Showa Denko K.K., 899 S.W.2d 749, 757 (Tex.Ct. App.1995) (same, in L-tryptophan case). However, in In re Norplant Contraceptive Products Liability Litigation, 961 F.Supp. 163, 166-67 (E.D.Tex.1997), the court distinguished Bell v. Showa Denko, supra, and held, in a diversity case governed by Texas law, that the Texas statute of limitations was tolled between the filing and the denial of class certification in a class action in the same federal district court alleging injury from Norplant contraceptive implants. See also Burton v. American Home Prods. Corp., 173 F.R.D. 185 (E.D.Tex.1997) (declining to vacate the order in In re Norplant Contraceptive Prods. Liab. Litig., supra).
No reported New Jersey decision has yet decided whether the filing of a class action, either in state or federal court, will toll our statutes of limitations in any type of case. However, we approach the question with the recognition that New Jersey law has been hospitable to equitably purposed procedural devices in various situations. Our "discovery rule," discussed at length in the first part of this opinion, is exemplary of that attitude. See Lopez v. Swyer, supra; Friedman v. Friendly Ice Cream Co., 133 N.J.Super. 333, 336 A.2d 493 (App.Div.1975), and cases cited in Pressler, Current N.J. Court Rules, comment 33.4 on R. 4:5-4 (1999). The fictitiousnames procedure provided for by R. 4:26-4, although requiring the commencement of an action against a "John Doe" defendant within the applicable period of limitations, is in substance another such procedural device which may extend the time within which a claimant *965 can seek redress from a party properly answerable for his claims. See Farrell v. Votator Div. of Chemetron Corp., 62 N.J. 111, 115-16, 299 A.2d 394 (1973). Applying the principle of equitable tolling, our court has held that a police officer who sexually assaulted a female driver whom he stopped, ostensibly to ticket her for speeding, was estopped from asserting the statute of limitations against her damage action because his dereliction in the performance of his official duty to report his crime had contributed to her inability to identify her assailant and to her consequent delay in filing suit. Dunn v. Borough of Mountainside, 301 N.J.Super. 262, 276-77, 693 A.2d 1248 (App.Div. 1997). In Hopkins v. Board of Review, 249 N.J.Super. 84, 591 A.2d 1371 (App.Div.1991), a Deputy Director in the Division of Unemployment and Disability Insurance ruled that $2,355 in unemployment benefits had been paid to their recipient erroneously and that she was obligated to repay that amount to the Division. The Appeal Tribunal within the Division ruled that the Deputy's decision was mistaken, that the claimant was eligible to resume receiving future benefits, but that she was nonetheless obligated to repay the $2,355 she had received because she had filed her appeal late. The Board of Review, the highest appellate tribunal within the Division, agreed. We reversed. We noted that the agency itself, in holding the claimant eligible for future benefits, had ruled that she had also been eligible to receive the benefits paid to her. We stated, "This being so, we are persuaded that requiring her to repay the benefits she properly and lawfully received, a repayment which is obviously an excruciating and disproportionate burden for her, is too unpalatable a disposition for a court of law to accept." Id. at 89, 591 A.2d 1371. On that premise we held, "[I]rrespective of whatever procedural deficiencies may have been committed ..., the Division is estopped from obtaining repayment of benefits which its own adjudicative arm has found to have been properly paid." Ibid. All of these examples of equitable constraints on the application of statutes of limitations reflect the consideration that, as stated in Zaccardi v. Becker, 88 N.J. 245, 256, 440 A.2d 1329 (1982):
[S]tatutes of limitations ... are based on the goals of achieving security and stability in human affairs and ensuring that cases are not tried on the basis of stale evidence. [Citations omitted.] Because they are based on these specific policies, they must be raised as affirmative defenses, subject to judicial modification in appropriate circumstances. Mechanistic application of such statutes could unnecessarily sacrifice individual justice in particular circumstances.
Zaccardi then quotes the following excerpt from Galligan v. Westfield Centre Service, 82 N.J. 188, 193, 412 A.2d 122 (1980):
A just accommodation of individual justice and public policy requires that in each case the equitable claims of opposing parties must be identified, evaluated and weighed. Whenever dismissal would not further the Legislature's objectives in prescribing the limitation, the plaintiff should be given an opportunity to assert his claim.

[88 N.J. at 256, 440 A.2d 1329.]
A long line of New Jersey cases have held that the filing of an action in one forum will toll the statute of limitations during the pendency of that proceeding so that, if the action is dismissed without an adjudication on the merits, the plaintiff can, subject to equitable considerations, pursue substantially the same claim in another forum, even if the action is instituted in the second forum after the expiration of the period of limitations. For example, timely filing of an action in the Law Division charging a public employer with unfair labor practices tolled the six-month period of limitations for filing the same claim before the Public Employment Relations Commission (PERC), which had exclusive jurisdiction. Kaczmarek v. New Jersey Turnpike Auth., 77 N.J. 329, 344, 390 A.2d 597 (1978). Because a survival action had been timely filed in federal court, a second action for the same claim, filed in state court just before the federal suit was dismissed for lack of diversity jurisdiction, was not barred although commenced after expiration of the period of limitations. Galligan, supra, 82 N.J. at 188, 412 A.2d 122. On the ground of lack of personal jurisdiction, a New York court dismissed a timely tort claim for alleged *966 mishandling of a corpse. After dismissal of the complaint and expiration of the New Jersey period of limitations, but before the time for appeal from the dismissal had expired, the plaintiff filed a complaint in our Superior Court alleging substantially the same cause of action. We affirmed the Law Division's denial of a motion to dismiss, holding that the pendency of the New York action tolled our statute of limitations until the plaintiff's time to appeal in New York had expired. Mitzner v. West Ridgelawn Cemetery, Inc., 311 N.J.Super. 233, 235-36, 709 A.2d 825 (App.Div.1998). A provider of medical services who files his claim for compensation in the Division of Workers' Compensation tolls the statute of limitations so that he can, if necessary, pursue the same claim in the Law Division without being barred by the expiration of the limitations period. Medical Diagnostic Assocs. v. Hawryluk, 317 N.J.Super. 338, 341-42, 722 A.2d 122 (App. Div.1998). Approximately two years after the expiration of the applicable period of limitations and more than two months after the plaintiff's timely filed federal district court action had been dismissed for lack of diversity jurisdiction, the plaintiff commenced a wrongful death action in our Superior Court. Affirming the Law Division's denial of a motion to dismiss on statute of limitations grounds, the New Jersey Supreme Court invoked the doctrine of "substantial compliance" and held that the New York filing and the New Jersey filing thereafter "substantially complied with the Wrongful Death Act's statute of limitations." Negron v. Llarena, 156 N.J. 296, 305, 716 A.2d 1158 (1998).
That line of cases convinces us that if Joseph Staub had been a named plaintiff in the Pantopaque putative class action filed in the United States District Court for the District of New Jersey, the period of limitations for commencing the present suit would be tolled during the pendency of that action. There would be no reason for the tolling effect of the initially filed suit to be any different if Staub were a disclosed or readily ascertainable party whom a named party purported to represent. No doubt that is the reason why the overwhelming majority of jurisdictions which have considered the issue hold that the pendency of a class action in which the plaintiffs purport to represent a class whose members are disclosed or readily ascertainable tolls statutes of limitations for substantially similar claims from its filing to the denial of class certification. The only difficult question posed by this aspect of the present case is whether the same tolling rule should apply in a case, like the present one, where the putative class action asserts a products liability claim or other mass tort on behalf of a class the identity of whose members was not known or readily ascertainable and where, therefore, the defendants did not have specific notice of the claim of the individual plaintiff on whose behalf tolling is sought.
Two years elapsed between the filing of the Pantopaque class action suit in the United States District Court for the District of New Jersey and the court's issuance of its opinion denying class certification. As the United States Supreme Court pointed out in American Pipe and Crown, Cork & Seal Co., if the pendency of a putative class action does not toll the statute of limitations for individual claimants who would be members of the class if it is certified, potential class members who have "discovered" their claims would be compelled to file suit to avoid expiration of the period of limitations. The efficient utilization of judicial resources and the reduction of costs to individual litigants are among the principal purposes of both state and federal class action rules. American Pipe, supra, 414 U.S. at 553-53, 94 S.Ct. at 766-67, 38 L. Ed.2d at 727; In re Cadillac V8-6-4 Class Action, 93 N.J. 412, 430, 461 A.2d 736 (1983). A tolling rule which permits individual claimants to refrain from filing suit pending a decision on certification of a class action that would encompass their claims is almost indispensable to accomplish those purposes. In fact, a contrary rule would reward defendants who caused a court to delay decision of class action certification until the statute of limitations had run against any potential plaintiffs who had "discovered" their cause of action as a result of publicity, like the "Geraldo" show's "Timebomb *967 Drugs" program, which had probably resulted from the filing of the class action.[4]
There has been no finding in the present case whether the Staubs postponed filing this suit because they were waiting for the district court to decide whether the federal suit would proceed as a class action that encompassed their claim. However, their retention of the class plaintiffs' lawyers, their regular receipt of information about that suit from the Arachnoiditis Foundation, and their commencement of the present suit within two years after the denial of class certification indicate that they probably did rely. (If the fact is disputed, a hearing and an appropriate finding may be necessary on remand.) Furthermore, reliance on the Staubs' part would not have been unreasonable. There have been class certifications in products liability suits. See In re Agent Orange Prod. Liab. Litig., 818 F.2d 145, 166-67 (2d Cir.1987); Dante v. Dow Coming Corp., 143 F.R.D. 136, 137-38 (D.C.Ohio 1992) (silicone breast implants); Wehner v. Syntex Corp., 117 F.R.D. 641, 645 (N.D.Cal.1987) (suit against dioxin manufacturer). See also Caroll J. Miller, Annotation, Class Actions in State Mass Tort Suits, 53 A.L.R.4th 1220 (1987). Although "there has been serious reluctance on the part of the courts to certify class actions under Rule 23(b)(3) arising out of mass torts," 7B Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, Federal Practice and Procedure § 1805 at 541 (2d ed.1986), there is nothing in the record in the present case to show that it should have been obvious to plaintiffs, or even to their attorneys, that class certification would ultimately be denied.
Tolling the statute of limitations for plaintiffs' claim on the basis of the facts of this case is not inconsistent with the policy of the statute of limitations. See Galligan, supra, 82 N.J. at 193, 412 A.2d 122. First of all, if plaintiffs deferred filing their suit in reliance on the pending federal putative action, they cannot be said to have slept on their rights. When they "discovered" their claim, they contacted attorneys. They kept abreast of the pending litigation. They commenced the present suit within two years after the denial of class certification. Secondly, the institution of the Pantopaque putative class action put defendants on notice of potential claims and undoubtedly led them to marshall and preserve relevant evidence. Thirdly, although defendants did not know of the specific claim of these plaintiffs until they commenced this suit, defendants knew within the period of limitations that if they were successful in defeating class certification, they would probably face individual suits asserting arachnoiditis claims. On the other side of the scale, however, is the fact that the effect of tolling is to defer defendant's point of "repose" for two additional years. Nevertheless, the New Jersey law of equitable tolling, which we previously discussed, convinces us that this consideration, although significant, is overborne by the other factors we have mentioned.
We hold, therefore, that from the filing of a putative class action until the entry of an order denying class certification, the applicable statute of limitations will be tolled for the claim of a plaintiff who would be a member of the asserted class if the class were certified and whose identity was disclosed or readily ascertainable upon the filing of the class action or upon its amendment within the period of limitations or who shows that he has deferred filing an individual suit in reliance on the pendency of the class action, provided that the plaintiff's claim is substantially the same as a claim alleged by the putative class plaintiff.
We therefore reverse the judgment appealed from and remand this matter to the Law Division for an in limine hearing pursuant to Lopez v. Swyer, supra, and for further proceedings consistent with this opinion. In order to avoid dismissal of their complaint on statute of limitations grounds, plaintiffs must show that they deferred filing this suit *968 in reliance on the Pantopaque federal class action and that no more than two years elapsed between plaintiffs' discovery of their cause of action and their commencement of the present suit if the time period between the filing of that action and the entry of the order denying class certification is disregarded.
Reversed.
NOTES
[1] Defendants contend that their product was accompanied by an adequate warning and they deny that it was defective. Neither we nor the Law Division has considered the merits of plaintiff's case.
[2] Defendants asserted other reasons in addition to the statute of limitations as grounds for granting their motion for summary judgment. However, the motion court considered only the statute of limitations.
[3] Magnetic resonance imaging.
[4] We see no reason for tolling to depend on whether the class action is pending in state or federal court. Tolling state statutes of limitations during the pendency of a putative class action in federal court would tend to promote the efficiency of both state and federal court systems because suits asserting the individual claims of the class members might be filed in either court system or in both. Furthermore, we have an interest in promoting the efficiency of both systems.