**Joseph M. YARCHAK, Plaintiff,**

v.

**TREK BICYCLE CORPORATION, Vetta U.S.A. Limited, Selle Italia, S.R.L., and Brunswick Corp., Defendants.**

**CIVIL ACTION NO. 00–5540(JEI).**

United States District Court,
D. New Jersey.

June 25, 2002.

Stuart D. Fiel & Associates by Vincent Presto, Esq., Cherry Hill, NJ, for Plaintiff.

Post and Schell by Jay A. Gebauer, Esq., Voorhees, NJ, for Trek Bicycle Corp.

Garrigle and Palm by William A. Garrigle, Cherry Hill, NJ, for Vetta U.S.A., Ltd.

Porzio, Bromberg & Newman by Jennifer Schettino, Esq., Morristown, NJ, for Selle Italia, S.R.L.

Greg Campisi, Esquire, Roseland, NJ, for Brunswick Corp.

## OPINION

IRENAS, District Judge.

Plaintiff, a resident of Connecticut, initially filed the instant action against Trek Bicycle Corporation ("Trek"), a New Jersey-based company, in the Superior Court of New Jersey, Camden County, asserting claims for negligence (Count I), breach of express and implied warranty (Count II), and strict products liability (Count III) arising out of injuries allegedly sustained by Plaintiff while using a defective bicycle seat. Following Trek's filing of a third party complaint against Defendants Vetta USA, Selle Italia, and Brunswick Corporation, companies allegedly involved in the manufacture, assembly, design and distribution of the bicycle seat at issue, Plaintiff was granted leave to file an Amended Complaint asserting his claims directly against those three additional defendants.[1] The case was subsequently removed to this Court, which has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1441 and 28 U.S.C. § 1332. Currently before the Court are Defendants Trek Bicycle Corporation, Vetta USA, and Selle Italia's respective motions for summary judgment.[2] Defendants Vetta USA and Selle Italia both seek summary judgment on the grounds that Plaintiff's claims for negligence (Count I) and strict products liability (Count III) are statutorily barred by the applicable statute of limitations. Defendant Vetta USA further moves for summary judgment on these claims on the grounds that there are no disputed issues of material fact regarding the company's lack of involvement in the manufacturing and/or selling of the allegedly defective product.[3] Defendants Trek and Selle Italia also move for summary judgment of Plaintiff's strict products liability claim (Count III) on the grounds that the proffered testimony of Plaintiff's two expert witnesses is inadmissible under Federal Rule of Evidence 702 and that, without such testimony, Plaintiff has failed, as a matter of law, to adduce sufficient proof to demonstrate a causal link between the allegedly offending bicycle seat and his inju-

---

**1.** As far as can be determined by the Court from the abbreviated record provided by the parties, the allegedly defective bicycle seat which is the subject of this litigation was originally manufactured by Defendant Selle Italia, an Italian company, between 1989 and 1993 and was ultimately packaged in a master carton labeled "Trek" and shipped directly to Defendant Trek Bicycle Corporation. (Vetta USA's Br. in Supp. of Mot. for Sum. Judg., Ex. D; Trek's Br. in Supp. of Mot. for Sum. Judg. at Ex. B, p. 41–43). The seat was then eventually distributed to a retailer in Willimantic, Connecticut, where it was purchased by Plaintiff along with a Mongoose bicycle. According to the deposition testimony of Steven Merlini, a Sales Manager with Selle Italia, the seat was manufactured with the "Trek" insignia pursuant to purchase orders provided by Orleander, a now defunct Swiss company which is not a party to this litigation. (Trek's Br. in Supp. of Mot. for Sum.

Judg. at Ex. B.). At the time, Orleander was the owner of the "Vetta USA" brand name. (*Id.* at Ex. B., p. 23). Plaintiff alleges that Defendant Vetta USA, a California-based company which incorporated in 1997 and at present appears to license the "Vetta" trademark, is liable as a successor-in-interest for the injuries caused by the allegedly defective bicycle seat. (Vetta USA's Br. in Supp. of Mot. for Sum. Judg. at 3; Trek's Opp. Br. at 22–23).

**2.** Defendant Brunswick Corporation was dismissed from the above-entitled action by consent of all of the parties on January 30, 2002.

**3.** Neither Selle Italia nor Vetta USA has specifically moved for summary judgment on Count II of Plaintiff's Amended Complaint which asserts a cause of action for breach of express and implied warranty.

ries or that there is a danger associated with use of the bicycle seat about which Defendants had a duty to warn. Trek also moves for summary judgment on its third party claim for common law indemnification (Count II) against Co-defendant Selle Italia.[4]

For the reasons set forth below, the Court will enter summary judgment with respect to Plaintiff's claims for negligence and strict liability against Defendants Selle Italia and Vetta USA, as such claims are barred, as a matter of law, by New Jersey's two-year statute of limitations for personal injury actions. However, the Court will deny Defendant Trek's motions for summary judgment against Plaintiff and Co-defendant Selle Italia.

### I.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986). The role of the court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248, 106 S.Ct. 2505 (citation omitted).

### II.

Plaintiff, Joseph M. Yarchak, first joined the Willimantic, Connecticut Police Department in 1989. In 1995, he became a member of the police department's bicycle patrol unit. (Pl.'s Dep. at 166). From June/July 1995 through the Fall of 1998, Officer Yarchak rode with the bicycle patrol unit approximately 10 to 12 miles per day, 5 days per week, for approximately 7 to 8 months a year. (*Id.* at 62, 64). The bicycle Officer Yarchak rode was equipped with a "Trek" seat from the time of its purchase until some point after February of 1998, when Officer Yarchack replaced the original seat with a "Biko" seat. (*Id.* at 49, 174).[5] Within a few months of beginning bicycle patrols in 1995, Officer Yarchak began regularly experiencing numbness and tingling in the groin area both during and immediately after riding the bicycle out on patrol. (*Id.* at 66). When these episodes occurred, he would dismount from his bicycle and walk around until the numbness subsided. The numbness or tingling would typically subside within 30 seconds to two minutes after stopping and dismounting from the bike's saddle. (*Id.* at 70). Yarchak had never experienced numbness or tingling in his groin area before joining the bicycle patrol unit and attributed the numbness to his

---

**4.** Defendant Selle Italia has asserted cross-claims for indemnification and contribution against co-defendants Trek and Vetta USA. Defendant Vetta USA is similarly pursuing cross-claims for indemnification and contribution against co-defendants Trek and Selle Italia.

**5.** The "Trek" logo was visibly displayed on Officer Yarchak's original seat, along with a marking indicating that the seat had been "Made in Italy."

extended periods of bicycle riding while on patrol. (*Id.* at 66; Selle Italia Br. Supp. Mot. Sum Judg. at Ex. B, p. 166–167).

In an April 22, 1997 visit with his family doctor, Dr. Ralph La Guardia, Officer Yarchak reported a couple of instances in 1997 in which he was unable to maintain an erection. (Pl.'s Br. Opp., Exhibit A, p. 73–77). He had never before experienced any symptoms of erectile dysfunction or impotence. (*Id.* at 75). According to Officer Yarchak's deposition, there was no discussion during this visit regarding any possible link between his bike riding and these symptoms because, at the time, he did not yet think it was a serious problem or suspect that these symptoms might be related to the numbing or tingling sensation he often experienced while bicycle riding. (*Id.* at 76–77).

Over time, however, Plaintiff's condition became progressively worse. At some point just prior to September 18th, Plaintiff viewed a promotional spot for an upcoming episode of the television news show 20/20 featuring reports on, among other topics, the possible link between impotency and bicycle riding. (*Id.* at 82). Although he was not able to watch the original September 18th broadcast of this 20/20 episode, he viewed a tape of the program approximately "two weeks later," either the "end of September or beginning of October" 1997. (*Id.*). This broadcast featured an interview with Dr. Irwin Goldstein, a professor of urology at Boston Medical Center and a leading researcher into a possible connection between bicycle riding and sexual dysfunction. (Selle Italia Br. Supp. Mot. for Sum. Judg., Exhibit B, at 80). According to Plaintiff's deposition testimony, it was this report on 20/20 that "first raised the question in [his] mind that there could possibly be a connection" between his erectile dysfunction and his bicycle riding. (Pl.s Opp. Br. at 81).

On October 21, 1997, after having viewed the program, Officer Yarchak visited Dr. La Guardia and told him about the 20/20 program, expressing concern that his erectile dysfunction may be connected to prolonged periods of bicycle riding while on patrol. Dr. La Guardia discussed with Plaintiff the possibility of a connection between his bicycle riding and his impotence, and referred him to Dr. John Graham, a local urologist, for further examination. In notes dictated on the same day as Plaintiff's visit, Dr. La Guardia opined that Plaintiff' impotence may be related to "secondary pressure from the bicycle seat causing problems." (Selle Italia's Mot. Br. in Supp. of Mot. for Sum. Judg. at Ex. D). During a visit to Dr. Graham on November 10, 1997, Plaintiff explained that he was a bicycle policeman, that he rode his bicycle for extended periods of time, and that, based on the 20/20 episode, he was concerned about a possible link between his impotence and the bicycle riding. (Vetta U.S.A.'s Mot. Sum. Judg., Exhibit F, at 89).

On or about February 19, 1998, Plaintiff visited Dr. Irwin Goldstein at the Boston Medical Center for an initial consultation. (Pl.'s Dep. at 112). Dr. Goldstein is a professor of urology at the Boston University School of Medicine and one of the nation's leading researchers on impotence. His ongoing research into the link between erectile dysfunction and bicycle riding was featured on the September 18, 1997 broadcast of 20/20 which originally gave rise to Plaintiff's concerns about the link between his impotency and his bicycle seat. Following his visit with Dr. Goldstein, Plaintiff replaced his Trek bicycle seat with a seat sold by Biko. (Pl.'s Opp. Br. at Exhibit A, p. 174). As Plaintiff's opposition brief explains, the Biko seat is specifically designed to distribute pressure away from the perineal arteries underneath the genitals. After switching to the Biko seat,

Plaintiff no longer experienced numbness or tingling in his groin area while on bicycle patrol. (Pl.'s Opp. Br. at 3). Approximately one year later, in February 1999, Dr. Goldstein conducted a diagnostic test, called an arteriogram, which, according to the doctor, revealed "specific blockage in the arteries that allow blood to flow to the penis" and confirmed a direct link between Officer Yarchak's impotence and the seat on his police department bicycle. Surgery performed on June 1, 1999 repaired Officer Yarchak's damaged arteries and appears to have rectified his erectile dysfunction.

On March 26, 1999, Officer Yarchak filed the instant action in the Superior Court of New Jersey, Camden County, against Trek Bicycle Corporation, the New Jersey-based seller and distributor of the bicycle seat which is alleged to have been the cause of his erectile dysfunction.[6] On August 1, 2000, Trek filed a notice of motion for leave to file a Third Party Complaint against Selle Italia, Vetta USA, and Brunswick Corporation, companies allegedly involved in the distribution, manufacture, and assembly of the seat. On September 8, 2000, with leave of the Superior Court, Trek filed a Third Party Complaint against these business entities. Plaintiff thereafter filed an Amended Complaint on October 10, 2000, with the Superior Court naming Vetta USA, Selle Italia, and Brunswick Corporation as additional party defendants in this products liability action. The case was subsequently removed to the District Court of New Jersey.

### III.

Defendants Selle Italia and Vetta USA have moved for summary judgment with respect to Plaintiff's claims for negligence (Count I) and strict products liability (Count III) on the grounds that such claims are barred by New Jersey's statute of limitations.[7] New Jersey's statute of limitations governing personal injury claims, including claims sounding in negligence and strict products liability, is found at N.J.S.A. 2A:14–2, which states:

---

**6.** In his original complaint, Plaintiff Yarchak did not name additional fictitious defendants as permitted by R. 4:26–4 of the New Jersey Court Rules.

**7.** This case raises certain issues with respect to whether the substantive law of Connecticut or New Jersey governs Plaintiff's claims. Federal Courts sitting in diversity generally apply the conflicts of laws principles of the forum in which they sit. See Calhoun v. Yamaha Motor Corp., 216 F.3d 338, 343 (3d Cir. 2000). Under New Jersey's choice of law jurisprudence, the New Jersey courts will generally apply the state's two-year personal injury statute of limitations, except in narrow circumstances where neither the litigation nor the parties to the action have any material contacts with New Jersey and a foreign state has "substantial interests" in the outcome of the litigation which outweigh those underlying New Jersey's statutory limitations period. See Gantes v. Kason Corporation, 145 N.J. 478, 679 A.2d 106 (1996); Heavner v. Uniroyal, Inc., 63 N.J. 130, 305 A.2d 412 (1973). As both sides assume, without fully briefing the issue, that New Jersey law supplies the applicable statute of limitations and no party has contended that New Jersey lacks a cognizable and substantial interest in the application of its statute of limitations, this Court refrains from raising this issue sua sponte. See, e.g., Osby v. A & E Television Networks, 1997 WL 338855 at *3 (E.D.Pa. 1997) ("Where the parties have agreed to apply Pennsylvania law, and Pennsylvania has an interest in the outcome of the litigation, there is no reason for the court, 'sua sponte, to challenge the parties consensual choice of law.' ") (quoting Steaks Unlimited, Inc. v. Deaner, 623 F.2d 264, 269–270 (3d Cir.1980)); Pierce v. Capital Cities Communications, Inc., 576 F.2d 495, 502 (3d Cir.1978). The Court will therefore assume, for purposes of this motion, that the Court's determination with respect to the timeliness of Plaintiff's negligence and products liability claims against Defendants Selle Italia and Vetta USA is governed by New Jersey's two-year statute of limitations.

Every action at law for an injury to the person caused by the wrongful action, neglect or default of any person within this state *shall be commenced within two years next after the cause of action shall have accrued.*

The purposes of New Jersey's statute of limitations are two-fold: "(1) to stimulate litigants to pursue a right of action within a reasonable time so that the opposing party may have a fair opportunity to defend, thus preventing the litigation of stale claims, and (2) to penalize dilatoriness and serve as a measure of repose." *Gantes*, 145 N.J. at 486, 679 A.2d 106. As the New Jersey Supreme Court explained in *Vispisiano v. Ashland Chemical Co.*, 107 N.J. 416, 527 A.2d 66 (1987), "[w]hen an injured party sleeps on his rights so long as to let the customary period of limitations expire, 'the pertinent considerations of individual justice as well as the broader considerations of repose coincide to bar his action.'" *Id.* at 462, 527 A.2d 66 (quoting *Farrell v. Votator Div. of Chemetron Corp.*, 62 N.J. 111, 299 A.2d 394 (1973)).

Ordinarily, a cause of action accrues at the time of the alleged injury.[8] This is because, in most cases, awareness of one's injuries is immediate and knowledge that someone is at fault is inherent in the nature of the injury or the circumstances in which it occurred. However, in order to alleviate the harsh results that might otherwise flow from a rigid or mechanical application of the statute of limitations, the New Jersey Supreme Court has devised an equitable principle known as the "discovery rule." Under the discovery rule, the accrual of a cause of action is delayed, in appropriate circumstances, until the injured party actually discovers, or by the exercise of reasonable diligence and intelligence reasonably should have discovered, that he may have a basis for an actionable claim. *See Staub v. Eastman Kodak Company*, 320 N.J.Super. 34, 42–43, 726 A.2d 955 (App.Div.1999) (quoting *Vispisiano*, 107 N.J. at 419, 527 A.2d 66). The relevant question is not, however, whether plaintiff had knowledge of a specific basis for legal liability or a provable cause of action, but rather when plaintiff was aware, or reasonably should have been aware of "the existence of a *state of facts* that may equate in the law with a cause of action." *Vispisiano*, 107 N.J. at 426, 527 A.2d 66. As the New Jersey Supreme Court has explained, the discovery rule places "emphasis on the factual nature of an injured party's knowledge of a basis for a cause of action ... [A] plaintiff must have an awareness of 'material facts' relating to the existence and origin of his injury rather than comprehension of the legal significance of such facts." *Lynch v. Rubacky*, 85 N.J. 65, 73, 424 A.2d 1169 (1981) (emphasis in original) (citing *Burd v. New Jersey Tel. Co.*, 76 N.J. 284, 291–293, 386 A.2d 1310); *see also Kemp Industries, Inc. v. Safety Light Corp.*, 1994 WL 532130 at *17 (D.N.J.1994). Moreover, the statute of limitations is triggered by a prospective litigant's awareness of material facts which equate in the law with a cause of action, not conclusive proof of every material fact. *See Hatco v. W.R. Grace & Co.*, 801 F.Supp. 1309, 1323 (D.N.J.1992); *Burd*, 76 N.J. at 303, 386 A.2d 1310 ("The proofs need not evoke a finding that plaintiff knew for a certainty that the factual basis was present. It is enough that plaintiff

---

**8.** Plaintiff testified at his deposition that he began to experience periodic episodes of impotency at some point prior to his April 22, 1997, visit with Dr. LaGuardia, his family physician. (See Pl.'s Opp. Br., Exhibit A, p. 73–77). Thus, if we assume, as Plaintiff claims, that the bicycle seat was the cause of his impotency, it appears that he sustained his alleged injuries almost three and one-half years prior to the filing of his Amended Complaint against Defendants Selle Italia and Vetta USA.

had or should have discovered that he 'may have' a basis for a claim.") (citing *Lopez v. Swyer*, 62 N.J. 267, 272, 300 A.2d 563 (1973)).

■ Knowledge or discovery of the basis for an actionable claim will be imputed where the Plaintiff was aware or, by exercise of reasonable diligence, should have been aware: (1) that he has been injured; and (2) that the injury is due to the fault or neglect of an identifiable individual or entity. *See Lynch*, 85 N.J. at 70, 424 A.2d 1169 ("the discovery rule centers upon an injured party's knowledge concerning the origin and existence of his injuries as related to the conduct of another person"). In Plaintiff's case, it is clear that he was aware of his injury or physical condition as early as April 22, 1997, over three years prior to filing his Amended Complaint against Defendants Selle Italia and Vetta USA. The more difficult question is when Plaintiff either knew or reasonably should have been aware that his physical condition was "due to the fault of another."

■ Discovering that one might have a basis for an actionable claim "means perceiving an injury and believing, or having reason to believe—*with a degree of firmness that would lead a reasonable person to investigate the matter if he is interested in seeking redress*—that his injury was probably caused by the fault of another. Certainty is not required." *Eastman Kodak.*, 320 N.J.Super. at 45, 726 A.2d 955; *see also, Savage v. Old Bridge–Sayreville Medical Group, P.A.*, 134 N.J. 241, 248, 633 A.2d 514 (1993). The first key issue in ascertaining when, for purposes of applying the discovery rule, the statute of limitations began to run on Plaintiff's products liability action is when Plaintiff was either aware or reasonably should have been aware of a potential causal link between his impotency and the bicycle seat—the product which is the subject of his products liability action. *See generally*, Ameri-

can Law of Products Liability 3d, § 47:36. The position of Plaintiff's counsel, as stated in Plaintiff's opposition brief, is that Officer Yarchak's cause of action against Trek and the other third-party defendants "did not begin to accrue *until February 1999* when, after the arteriogram, Dr. Goldstein advised Officer Yarchak for the first time that his impotency was caused by the bicycle 'seat." (Pl.'s Opp. Br.). However, under the New Jersey Supreme Court's "discovery rule" jurisprudence, it is firmly established that a prospective litigant is not entitled to await specific medical confirmation of a connection between his physical symptoms and a product before the statute of limitations will begin to run. *See Lapka v. Porter Hayden Co.*, 162 N.J. 545, 557, 745 A.2d 525 (2000); *Vispisiano*, 107 N.J. at 437, 527 A.2d 66. In other words, medical certainty regarding a plaintiff's medical condition and the causal relationship between his medical condition and a particular product is not required before a plaintiff will be deemed to have discovered the basis for a cause of action. Less clear, however, is at what point, prior to receiving specific medical confirmation of a possible causal link, a prospective litigant's cause of action will be deemed to have accrued.

Several New Jersey Supreme Court decisions have addressed the state of knowledge required to impute discovery of a possible causal relationship between plaintiff's injuries and a particular product and to trigger the running of the statute of limitations. *See Burd*, 76 N.J. 284, 386 A.2d 1310 (1978); *Vispisiano*, 107 N.J. 416, 527 A.2d 66 (1987); *Graves v. Church & Dwight Company, Inc.*, 115 N.J. 256, 558 A.2d 463 (1989); *Lapka*, 162 N.J. 545, 745 A.2d 525 (2000). As is evident from these decisions, the Supreme Court's consideration of this issue has produced few clear, consistently applied standards. Moreover, application of the discovery rule

involves a highly fact-specific inquiry and will often vary depending on the nature and circumstances of the plaintiff's injury and the type of case involved. *See Vispisiano*, 107 N.J. at 434, 527 A.2d 66 ("[T]he nature of the information necessary and the quality of the requisite state of mind will of course vary from case to case, and more than that, from type of case to type of case"). Nevertheless, a review of these cases provides some indication of the nature and quality of the information which must be available to a prospective litigant before the statute of limitations will begin to run.

In *Burd*, a contractor's laborer, who had sustained a heart attack while working in a trench gluing together plastic pipe, brought a products liability action against the supplier and the manufacturer of the industrial glue, claiming that the glue contained a noxious substance which, given the confined environment in which he was working, was a substantial contributing factor in bringing about his heart attack. 76 N.J. at 287, 386 A.2d 1310. Plaintiff had been working in the trench during the week preceding his heart attack and had experienced dizziness and light headaches while working with the glue, symptoms which would invariably subside within an hour after he finished work. *Id.* at 289, 386 A.2d 1310. A physician who later examined plaintiff for purposes of pursuing a worker's compensation claim had drawn a connection between the glue and plaintiff's heart attack. *Id.* The Court concluded:

> The regular incidence of lightheadedness and dizziness while using the glue, and the disappearance of the symptoms shortly after cessation of plaintiff's exposure thereto, together with the permissible inference from proofs that plaintiff realized the connection between the glue and the symptoms (although at trial he denied such knowledge), furnishes a substantial credible basis for an inference of

knowledge by plaintiff at least shortly after the heart attack that the exposure to the fumes of the glue in the warm trench was in some way related to the attack.

*Id.* at 292–293, 386 A.2d 1310. Under the circumstances, the Court concluded that within a short time after his heart attack, plaintiff possessed either actual or constructive knowledge of a possible causal relationship between the noxious industrial glue and his injuries, triggering the running of the statute of limitations. *Id.* at 293, 386 A.2d 1310.

In *Vispisiano*, a former employee at a toxic-waste disposal site brought suit against the suppliers, processors, manufacturers, and distributors of the toxic-waste materials to recover damages for medical complications and physical ailments allegedly resulting from his exposure to toxic chemical wastes during the six months he was employed at the site. 107 N.J. at 419–420, 527 A.2d 66. The plaintiff had experienced recurring headaches during the six months he worked at the disposal site. *Id.* at 421, 527 A.2d 66. Plaintiff had also visited a co-worker in the hospital whom he learned had been exposed to chemicals while at work and was experiencing symptoms similar to his own. *Id.* at 422–23, 527 A.2d 66. Following this meeting, plaintiff began to suspect that his symptoms may be related to his possible exposure to noxious chemicals while at work and consulted with two physicians. While neither physician specifically "ruled out" the possibility that plaintiff's symptoms were attributable to occupational exposure to chemicals, both doctors offered what they believed were much more probable explanations for plaintiff's symptoms and either brushed aside or downplayed the possibility that plaintiff's deleterious medical condition was related to chemical exposure. *Id.* at 423–424, 527 A.2d 66.

The New Jersey Supreme Court ultimately reversed a grant of summary judgment on statute of limitations grounds after finding the information available to the plaintiff insufficient to put him on notice that his exposure to toxic chemicals might have caused the injuries that were the subject of his suit. The Court expressly noted that specific "medical confirmation" of causation is not necessary to trigger the statute of limitations, reaffirming a principle implicit in its decision in *Burd. Id.* at 437, 527 A.2d 66. However, the Court distinguished its decision in *Burd* on its facts and attempted to further clarify the state of knowledge or quality of available information necessary to charge a prospective litigant with awareness of a possible causal relationship between his injuries and a particular product. As the Court explained, the plaintiff's *"uninformed—or, at least, medically uninformed—speculation* after comparing notes with his [hospitalized co-worker] and the at-best-*equivocal* information obtained from his treating physicians" was not sufficient to trigger the running of the statute of limitations. *Id.* at 436, 527 A.2d 66. Rather, the Court held that, "before a toxic-tort plaintiff may be deemed to have the requisite state of knowledge that would trigger the running of the statute of limitations, his impression of the nature of the injury and its cause must have *some reasonable medical support."* *Id.* at 437, 527 A.2d 66. As the Court further explained, "We hasten to add that we do not insist on medical confirmation as such: a physician's willingness to include chemical poisoning in the differential diagnosis would probably suffice, as would any other reasonably reliable source of information." *Id.*

In *Graves,* the New Jersey Supreme Court, while not explicitly relying on the standard set forth in *Vispisiano,* essentially extended that case's holding to a products liability action alleging liability for failure to warn of the dangers of ingesting a commonly used household product. 558 A.2d at 470. While on vacation in Martha's Vineyard, the plaintiff, William Graves, awoke sometime after midnight suffering from mild indigestion. Unable to find the over-the-counter medicine he ordinarily used to alleviate his discomfort, Mr. Graves decided to improvise. He remembered that as a child his mother had sometimes given him bicarbonate of soda to relieve his stomach aches. He poured some Arm & Hammer Baking Soda, which he had found in one of the kitchen cabinets, into a glass and filled the glass with water. After drinking several swallows, Mr. Graves immediately began experienced excruciating pain in his stomach and collapsed to the floor. He was rushed to Martha's Vineyard Hospital where he was diagnosed with a perforated viscus (a tear in the upper gastrointestinal tract region). The attending surgeon informed plaintiff's wife that his situation was critical and that emergency surgery would be necessary. After opening Mr. Graves's stomach to determine the cause of his pain, the surgeon discovered a two and one-half inch long rent or tear in the upper part of his stomach near his esophagus. The "surgical diagnosis was a perforated ulcer of unknown origin despite the fact that such ulcers usually appear at the bottom portion of the stomach and are of smaller size." *Id.* at 259, 558 A.2d 463.

While plaintiff had included his ingestion of baking soda as part of his medical history, no medical report filed with the hospital following the incident either "asserted or suggested that plaintiff's acute reaction was caused by any aspect of the baking soda." *Id.* Hospital staff familiar with plaintiff's case were admittedly at a loss to explain what had caused Mr. Grave's stomach to suddenly and unexpectedly rupture. The cause was discussed at a regular staff meeting on the Friday following the operation, but "no member of the staff, which

included gastroenterologists, questioned the role of the baking soda." *Id.* Plaintiff continued to experience complications which required a series of six corrective operations and frequent hospitalization. While the records of these procedures "often refer[red] to the stomach rupture as 'secondary' to the taking of bicarbonate of soda, no physician associated with [plaintiff's] later care ever believed that the condition was caused by the baking soda." *Id.* at 259–260, 558 A.2d 463. The several physicians and surgeons from whom Mr. Graves received treatment invariably expressed skepticism that the ingestion of baking soda had "caused" plaintiff's stomach to rupture. *Id.*[9]

Four years after the incident, one of the plaintiff's co-workers saw a televised news account of a spontaneous stomach rupture. *Id.* at 260, 558 A.2d 463. Graves, who tuned into the news too late to catch the report, requested a tape of the broadcast from the television station. The news story described the experience of a resident of the Washington, D.C. area who claimed to have suffered an almost identical experience after ingesting baking soda. *Id.* Plaintiff himself was later interviewed by the news staff of the television program in a follow-up interview broadcast on the metropolitan Washington news. *Id.* In a subsequent phone conversation with the attorney for the D.C. resident interviewed in the original news story, Mr. Graves asked whether the attorney thought he might have a cause of action. The attorney did not give him a definitive answer, but did tell plaintiff that the circumstances of his injury did sound similar to his client's case. *Id.* Plaintiff then called the Martha's Vineyard surgeon who had performed the first operation on plaintiff's stomach and related the story to him. The

surgeon agreed that if it were scientifically possible for baking soda to cause rapid stomach expansion, then the Arm & Hammer was a possible cause of his injuries. *Id.* Soon after this conversation, Graves instituted a products liability action against Arm & Hammer.

The Law Division granted Defendant Arm & Hammer's motion to dismiss on the basis of the statute of limitations. The trial court's reasoning emphasized the plaintiff's knowledge of his injury, his awareness that his ingestion of baking soda had immediately preceded the rupture of his stomach, and the availability of medical and scientific literature suggesting that the possibility of a causal relationship between baking soda and stomach perforation. *Id.* at 260–261, 558 A.2d 463. The Appellate Division, in a decision ultimately affirmed by the Supreme Court, disagreed, however, accepting the trial court's factual determinations, but disagreeing as to the legal significance of those facts. In a decision that appears to rest both on the state of the plaintiff's knowledge and a balancing of the equitable considerations involved in the application of the discovery rule, the Appellate Division concluded that the plaintiff could not be held to have been constructively aware of the causal connection between the baking soda and his medical condition. Significantly, the court's reasoning closely resembled that articulated by the Supreme Court in *Vispisiano*:

> [A] layman should not be charged with knowledge of cause and effect, even cause and effect which he may suspect, when the physicians who are treating him and who have the same factual information on which his own suspicions are based completely discount the validity of those suspicions.

9. Indeed, "one Georgetown University physician who took Graves' medical history testified that he wrote an exclamation point after the reference to sodium bicarbonate to indicate his disbelief." *Id.* at 259, 558 A.2d 463.

*Id.* at 261, 558 A.2d 463 (quoting *Graves v. Church & Dwight Company, Inc.*, 225 N.J.Super. 49, 56, 541 A.2d 725 (App.Div. 1988)). While ultimately affirming the Appellate Division, the New Jersey Supreme Court was equally divided on the central question: when the plaintiff knew, or should have known, of a possible causal connection between his injury and the ingestion of the product with sufficient certainty to trigger the running of the statute of limitations on his failure-to-warn claim against the manufacturer. Three of the Justices voted to affirm the decision of the Appellate Division, agreeing that the equitable considerations weighed in favor of applying the discovery rule to preserve the plaintiff's cause of action:

> Of course, it is easy now to equate the two (baking soda and defective product), but was it easy then? To suggest that the plaintiff should have known that baking soda could cause stomach rupture would attribute to him knowledge superior to that of all the physicians who treated him ... none of whom had ever suggested that his ruptured stomach was attributable to an adverse reaction to the baking soda.

*Id.* at 262, 558 A.2d 463. Although the concurring opinion did not identify the point at which plaintiff's cause of action did in fact begin to accrue, the Justices voted to affirm the Appellate Division's conclusion that the plaintiff could not have been held to have possessed sufficient knowledge of a possible causal connection between the product and his injuries until he viewed the tape of the television broadcast featuring an interview with an individual who had had a similar experience and had retained counsel. *See Graves*, 225 N.J.Super. at 52–53, 541 A.2d 725. The report included "a physician's statement in support of the relationship between defendant's product and spontaneous rupture of the stomach, concluding with the observation that since 1926 six or seven cases of

spontaneous rupture had been reported in the medical literature." *Graves*, 115 N.J. at 274, 558 A.2d 463.

The three dissenting Justices criticized the concurring opinion as marking a dramatic departure from settled law and an unwarranted extension of *Vispisiano*. *Id.* at 275, 558 A.2d 463. While agreeing that the principles articulated in *Vispisiano* should not necessarily be confined to toxic tort cases, the dissent objected to the application of these principles to a situation in which the source of plaintiff's serious medical condition should have been obvious from the moment of the initial injury. *Id.* at 276, 558 A.2d 463. The standard or test articulated by the concurring opinion, the dissent asserted, would unwisely and unnecessarily complicate the Court's discovery rule jurisprudence by adding yet another layer of proof before disallowing application of the discovery rule to postpone the accrual of a cause of action:

> Henceforth, the cause of action in a personal injury case would be deemed to arise not when plaintiff is aware of the facts that may equate in law with a cause of action, but rather when plaintiff and his or her physicians are prepared to *prove* the medical connection. And so while ignorance of the law remains no excuse, the professional's medical "unawareness" (no need to resort to the pejorative "ignorance") would act to excuse a plaintiff's failure to file a complaint in time. Before disallowing application of the discovery rule, a court would have to conclude not simply that plaintiff was aware of facts bespeaking the causative fault of the offending instrumentality, but that his physicians as well were prepared to prove that plaintiff's theory was correct, that the plaintiff's understanding was in fact correct.

*Id.* at 275, 558 A.2d 463. Unlike the plaintiff in *Vispisiano* who had been mislead or

distracted by his treating physicians' false assurances that chemical poisoning was a highly unlikely cause of his injuries, Graves, despite his physicians' skepticism, "continued in the years following the event to include in his medical history the connection between the defendant's product and his stomach rupture." *Id.* at 276, 558 A.2d 463.

The New Jersey Supreme Court recently revisited its decision in *Vispisiano* in a 5–2 opinion which further highlights the difficulty of applying the "standard" articulated in *Vispisiano* to a specific set of facts. *See Lapka v. Porter Hayden Company,* 162 N.J. 545, 745 A.2d 525 (2000). In *Lapka,* a longtime employee of the Essex Chemical Corporation filed a complaint alleging injury caused by occupational exposure to asbestos. Plaintiff worked as a chemical operator and hot-melt operator, jobs which required him to mix a liquid with pigment and asbestos powder in the manufacture of paneling glue. *Id.* at 527. Plaintiff also assisted in the manufacture of other products, such as paint and urethane. Over the course of his employment, plaintiff was exposed to finished and unfinished asbestos products, dust, particles, fibers, and other hazardous substances. *Id.*

Plaintiff was first diagnosed with pulmonary emphysema over eight years before filing his complaint. Approximately one week after this initial diagnosis, plaintiff was admitted to the hospital after complaining of shortness of breath. A chest X-ray revealed that plaintiff suffered from "pleural thickening" and "increased markings within the lungs" compatible with a "previous inflammatory disease." *Id.* at 549, 745 A.2d 525. Following his discharge from the hospital, plaintiff's treating physician rendered a final diagnosis, confirming that plaintiff suffered from "pulmonary fibrosis and emphysema." *Id.* Plaintiff subsequently went on disability leave. Before returning to work, plaintiff's treating physician exchanged correspondence with the chemical company's physician, recommending, in view of his diagnosed pulmonary condition, that plaintiff be transferred to another position "in a less toxic area." *Id.* at 550, 745 A.2d 525. The company physician agreed, observing that "[s]uitable occupational placement in the future must include a work environment that prevents any possibility of significant inhalation exposure." *Id.* at 550, 745 A.2d 525. Upon returning to work, plaintiff was transferred to a desk job in an area that would not risk potentially aggravating his lung ailment. *Id.* A few years later, plaintiff was again admitted to the hospital complaining of shortness of breath, weight loss, and general fatigue. *Id.* An X-ray confirmed the medical center's diagnosis of "chronic obstructive pulmonary disease." *Id.*

Approximately one and a half years later, plaintiff signed a workers' compensation claim petition alleging, among other things, "sustained pulmonary and internal organ disability" due to occupational exposure to "asbestos, noise, and chemicals." *Id.* at 551, 745 A.2d 525. Precisely two years to the day before the filing of plaintiff's complaint, plaintiff was seen by a physician who, based on a review of plaintiff's medical history and a physical examination concluded that plaintiff's "chest condition is causally related to or exacerbated by the exposure to ... pulmonary noxious agents [including dust, fumes, dirt, asbestos, carbon monoxide, chemicals used in plastic products, petroleum products, paints, powders, solvents, acetone and extremes in temperature ...] while employed by Essex Chemical Corp." *Id.* at 552, 745 A.2d 525.

In November 1996, approximately eight years after filing his complaint and just one day prior to his death, plaintiff was once again admitted to the hospital. *Id.*

The admitting attendant completed plaintiff's medical history form, using information elicited during his conversation with plaintiff and plaintiff's wife. The form noted that plaintiff "stoped [sic] working in 1984 when he was diagnosed [with] asbestosis." *Id.* Plaintiff's patient chart noted that "according to patient and his wife, this pt has h/o [history of] emphysema & asbestosis & silicosis since '84." *Id.* Another entry indicated that plaintiff "had h/o COPD [chronic obstructive pulmonary disease] for > 20 yr., c [with] asbestosis silicosis diagnosed about 12 years ago [1984]." *Id.*

After reviewing the undisputed facts contained in the record, the Court affirmed the lower court's grant of summary judgment, agreeing that the Plaintiff's claims were barred by New Jersey's two-year statute of limitations. The Court concluded that plaintiff knew enough by 1984 to prompt diligent inquiry as to whether the exposure to workplace substances was having a deleterious effect on his health. *Id.* at 554, 745 A.2d 525. The Court also explicitly rejected the suggestion "that the discovery rule delays the accrual of a cause of action until a claimant acquires an exact medical diagnosis of an asserted medical condition." *Id.* at 555, 745 A.2d 525. The Court placed particular emphasis on plaintiff's worker's compensation petition in which he listed occupational exposure to various chemicals and toxins, including asbestos, as a possible cause of his pulmonary and internal organ disability. *Id.* at 554–555, 745 A.2d 525. The Court further noted that, precisely two years to the day before filing suit, plaintiff had related his medical history to a physician, including in his personal history the fact that he had been exposed to asbestos and other noxious agents while working for Essex Chemical. *Id.* at 556, 745 A.2d 525. According to the Court, this allowed for an inference that the plaintiff had knowledge of or access to information revealing that

his exposure to asbestos had caused or, at least, contributed to his injury in advance of that date. *Id.* at 556–557, 745 A.2d 525.

The Court distinguished its decision in *Vispisiano,* noting in particular that plaintiff's reliance on his treating physicians' shared opinion that chemical exposure was not a likely cause of his injuries:

Although the record in *Vispisiano* contained information allowing the plaintiff to draw a causal connection between his symptoms and occupational exposure to toxins, his doctors discouraged the belief that there was a connection sufficient to form the basis of a cause of action. The plaintiff persisted in learning the cause of his symptoms and eventually obtained the proper diagnosis. On those facts, we held that plaintiff's suit was not untimely in accordance with the discovery rule. We did not hold in *Vispisiano* that medical confirmation of plaintiff's injury in a toxic tort case is necessary for a cause of action to accrue. Indeed, we carefully noted the distinction between "some reasonable medical support" and "medical confirmation," requiring only the former for purposes of imputing discovery.

*Id.* at 557, 745 A.2d 525. (internal citations omitted). Rejecting the argument that the *Vispisiano* standard dictated a different conclusion, the Court observed that the "record amply provides 'some reasonable medical support' in respect of plaintiff's claim," but did not specifically identify the medical evidence or opinions supporting the plaintiff's subjective suspicions, as articulated in his worker's compensation petition, that the damage to his lungs had been caused by occupational exposure to asbestos and other noxious agents. *Id.* at 558, 745 A.2d 525.

 The decisions in these cases illustrate the difficulty of applying the discovery rule to any particular set of facts.

The absence of clear, consistently applied, standards compounds this difficulty. Nevertheless, we can draw from these cases a few principles which help to guide the Court's application of the rule. Taken together, these cases suggest that, before a cause of action will be deemed to have accrued, a prospective litigant must be shown to have had an informed suspicion—based on "some reasonable medical support"—that a particular product or toxin may have either caused or contributed to the injuries which are the subject of his suit. *See Vispisiano*, 107 N.J. at 437, 527 A.2d 66; *see, e.g., Apgar v. Lederle Lab.*, 123 N.J. 450, 455, 588 A.2d 380 (1991) (holding claim time-barred where plaintiff knew her teeth had been discolored and, based on information from several dentists, surmised that the medication that she had taken as a child had caused the staining). However, neither "medical confirmation" of a potential causal connection nor an "exact diagnosis of [a plaintiff's] asserted medical condition" is necessary before the statute of limitations will begin to run. *See id.; Lapka*, 162 N.J. at 557, 745 A.2d 525; *see also, Mancuso v. Neckles*, 163 N.J. 26, 35, 747 A.2d 255 (2000) (observing that "the *Vispisiano* Court did not mean to suggest that the plaintiff must have an expert report in hand before the statute of limitations will commence to run."). Ordinarily, where a plaintiff has reason to suspect a possible nexus between his physical injuries or condition and a product or toxic chemical, a treating physician's willingness to include that possibility in a differential diagnosis will often suffice to commence the running of the statute of limitations. *See Vispisiano*, 107 N.J. at 437, 527 A.2d 66. On the other hand, the Court's decision in *Lapka* suggests that a differential diagnosis from a physician, while probably sufficient, is not necessary before a prospective litigant who otherwise has some reasonable medical support for suspicions will be deemed to have pos-

sessed the requisite degree of knowledge triggering the running of the statute of limitations.

■ Under New Jersey law, the burden of proof with respect to the application of the discovery rule rests with the party seeking to claim the benefit of that rule. *See Lopez v. Swyer*, 62 N.J. 267, 300 A.2d 563 (1973). Accordingly, "on the defendant's motion for summary judgment on the basis of the statute of limitations, 'it is the plaintiff who then bears the burden of pointing to specific facts of record that would justify the factfinder in concluding that the suit is timely' under the discovery rule." *Maertin v. Armstrong World Industries*, 2000 WL 554168 (D.N.J. May 3, 2000) (Simandle, J.) (quoting *Estate of Sarocco v. General Elec. Co.*, 939 F.Supp. 91, 95 (D.Mass.1996)). Here, Plaintiff filed his Amended Complaint against Defendants, Selle Italia, Vetta U.S.A., and Brunswick Corporation, on October 10, 2000. In order to survive a motion for summary judgment based on New Jersey's two-year statute of limitations, Plaintiff must demonstrate that there exist material issues of fact which, if resolved in Plaintiff's favor, would permit a reasonable factfinder to conclude that Plaintiff neither learned or nor reasonably should have learned of a state of facts equating in the law with a cause of action against Defendants prior to October 10, 1998.

While the parties do not appear to have provided all of the relevant portions of the record, the undisputed facts presently before the Court leave little doubt that Plaintiff knew he was suffering from impotency and that, more than two years before filing his Amended Complaint—i.e. before October 10, 1998—he believed or reasonably should have believed—with a degree of firmness that would have led a reasonable person to investigate the matter if he were interested in seeking redress—that his im-

potency may be causally related to the allegedly defective bicycle seat which is the subject of his products liability action. At his deposition, Plaintiff testified that he first began to suspect that the numbing sensation he regularly experienced while bicycle riding might be related to his impotency at or around the end of September or beginning of October of 1997, approximately three years prior to the filing of Plaintiff's Second Amended Complaint. Plaintiff's suspicions were aroused when he viewed a videotaped recording of the television news program 20/20 discussing, among other things, the link between impotency and bicycle riding. This program included a segment about the ongoing research of Dr. Irwin Goldstein, a urologist at the Boston Medical Center, into the possible link between bicycle seats and impotency. Thus, unlike the plaintiff in *Vispisiano*, Plaintiff's suspicion that his bicycle riding may be to blame for his erectile dysfunction was not based simply on his own "uninformed speculation," but rather was based on the research findings of a specialist in the field of urology.

Plaintiff later communicated his concerns about the possibility of a link between his bicycle riding and his erectile dysfunction to his family physician, Dr. LaGuardia, during a visit one month later on October 21, 1997. Dr. LaGuardia appears to have considered the possibility worthy of further exploration and referred Plaintiff to Dr. John Graham, a local urologist, for further examination. Although Plaintiff does not recount the pertinent details of his conversations with Dr. LaGuardia and Dr. Graham, there is no evidence in the record that these physician's dismissed or downplayed the possibility of a causal link between Plaintiff's impotence and his bicycle riding or otherwise misled Plaintiff. Indeed, a document introduced during Dr. LaGuardia's deposition entitled "Worker's Compensation" and dated October 21, 1997, contains the following observation:

> He [Yarchak] does suffer with possible impotence related to his bicycling as a police officer. He is having problems over the last year or so, on and off. Seems to be getting worse. I have referred him to Dr. John Graham from urology. This could be secondary to pressure from the bicycle seat causing problems.

(Selle Italia's Br. in Supp. of Mot. for Sum Judg. at Ex. D.). Dr. LaGuardia confirmed during his deposition testimony that he had dictated these notes following Plaintiff's visit. (Vetta USA's Br. in Supp. of Mot. for Sum. Judg. at Ex. G). Dr. LaGuardia further testified that his observation that pressure from the bicycle seat might be the cause of Plaintiff's episodes of erectile dysfunction was not simply a recitation of the concerns Plaintiff had communicated to him, but rather was a conclusion that he had reached "independently" based on his own medical expertise and the information provided to him by the Plaintiff. (*Id.*) Thus, the undisputed evidence reveals that, as early as September 1997, Plaintiff's suspicions amounted to more than sort of uninformed speculation exhibited by the plaintiff in *Vispisiano*. To the contrary, Plaintiff's concerns received "reasonable medical support" from at least one leading researcher in the area and were seriously entertained by his treating physician. Accordingly, the Court concludes that Plaintiff knew or reasonably should have been aware of a possible causal connection between the allegedly offending product and his medical condition more than two years prior to the filing of his Amended Complaint against Defendants Selle Italia and Vetta USA.

 Generally, once a prospective litigant knows he has been injured and knows or has reason to know that *someone*

has probably been at fault, the statute of limitations will begin to run as to all those individuals or entities within the universe of potential defendants whose identities are reasonably ascertainable, regardless of whether the aggrieved party knows the specific identity of those responsible for her injuries.[10] *See Apgar v. Lederle Laboratories,* 123 N.J. 450, 588 A.2d 380 (1991) (rejecting plaintiff's argument that the statute of limitations did not begin to run until she learned the identities of the manufacturers of the drugs which had allegedly permanently discolored her teeth); *Viviano v. CBS, Inc.,* 101 N.J. 538, 503 A.2d 296 (1986) ("Although she did not know the specific identity of the wrongdoer or of the particular component part that caused the machine to malfunction, she was aware that the fault of another had caused her to suffer personal injuries."). This is because once an injured person knows that he has been injured and that the injury is attributable to the act of another "it behooves the worker to consult counsel promptly. It then becomes incumbent on counsel to investigate the matter, retain experts if required, and institute the suit when the facts suggest a claim is well-founded. If counsel is uncertain about the identity of a culpable party, he or she may resort to the fictitious-name procedure in Rule 4:26–4." *Viviano,* 101 N.J. at 548, 503 A.2d 296 (1986). Rule 4:26–4 provides that:

In any action, irrespective of the amount in controversy, other than an action governed by R.4:4–5 (affecting specific property or res), if the defendant's true name is unknown to the plaintiff, process may issue against the defendant under a fictitious name, stating it to be fictitious and adding an appropriate description sufficient to identify him. Plaintiff shall on motion, prior to judgment, amend his complaint to state defendant's true name, such motion to be accompanied by his affidavit stating the manner in which he obtained that information.

Rule 4:26–4 has been construed to "permit a plaintiff who institutes a timely action against a fictitious defendant to amend the complaint after the expiration of the statute of limitations to identify the true defendant. Where this procedure is followed, the New Jersey courts have recognized that an amended complaint specifically identifying the defendant by its true name relates back to the time of filing of the original complaint, thereby permitting the plaintiff to maintain an action that, but for the fictitious party practice, would be time-barred." *Viviano,* 101 N.J. at 548, 503 A.2d 296. Thus, the fictitious party rule permits a plaintiff to preserve a claim against as yet unidentified potential defendants who may have contributed to plaintiff's injuries. *See Mancuso,* 163

---

10. Plaintiff argues that the New Jersey Products Liability Law, codified at N.J.S.A. § 2A:58C–1 et. seq., operates to toll the statute of limitations against Defendants Selle Italia and Vetta USA. Subsection (a) provides that:

> In any product liability action against a product seller, the product seller *may* file an affidavit certifying the correct identity of the manufacturer of the product which allegedly caused the injury, death, or damage.

Subsection (e) of the same provision further provides that:

> The commencement of a product liability suit based in whole or in part on a doctrine

of strict liability against a product seller shall toll the applicable statute of limitations *with respect to manufacturers who have been identified pursuant to the provisions of subsection a. of this section.*

However, the record contains no indication that Trek Bicycle Corporation, the product seller and distributer, ever filed an affidavit pursuant to 2A:58C–9(a) certifying either Selle Italia or Vetta USA as the manufacturers of the specific product or component which allegedly caused Plaintiff's injuries. The tolling provision of the New Jersey Products Liability Law therefore does not appear to be applicable.

N.J. at 35 n. 1, 747 A.2d 255 ("[T]he fictitious party rule is available when one reasonably suspects that others (such as the manufacturer of a component part) may have injured him or her but simply does not know the name of the person or party suspected").

The statute of limitations does not necessarily begin to run as to all potentially responsible parties at the moment a plaintiff knows that some identifiable individual or entity is potentially responsible for his injuries. *See Gallagher v. Burdette–Tomlin Memorial Hospital,* 163 N.J. 38, 43, 747 A.2d 262 (2000). The statute of limitations may begin to run at different times for different defendants. *Id.* Within the New Jersey Supreme Court's current "discovery rule" jurisprudence, there is a subcategory of the "knowledge of fault" cases in which "a plaintiff knows she has been injured and knows the injury is the fault of another, but does not know that an additional third party was also responsible for her plight." *See Caravaggio v. D'AGOSTINI, M.D.,* 166 N.J. 237, 248, 765 A.2d 182 (2001). These cases generally "reaffirm the basic principle that where a plaintiff knows of an injury and that the injury is due to the fault of another, he or she has a *duty to act,*" that is an obligation to undertake a reasonably diligent inquiry to ascertain the identify those individuals or entities potentially responsible for plaintiff's injuries. *Caravaggio,* 166 N.J. at 249–250, 765 A.2d 182. (emphasis added). However, these cases also stand for the proposition that "when a plaintiff knows of an injury, and knows that it is the fault of another, *but is reasonably unaware that a third party may also be responsible,* the accrual clock does not begin ticking against the third party until plaintiff has *evidence that reveals his or her possible complicity.*" *Caravaggio,* 166 N.J. at 250, 765 A.2d 182 (emphasis added); *See, e.g. Martinez v. Cooper Hospital–University Medical Center,* 163 N.J. 45, 55, 747 A.2d 266 (2000) (wife of a man who had suffered a severe beating and whose death was officially recognized as a homicide was not in emergency room when her husband was admitted and had been assured by emergency room physician that everything had been done properly and therefore had no reason to suspect that the delay in treatment had contributed to her husband's death); *Savage v. Old Bridge–Sayreville Medical Group, P.A.,* 134 N.J. 241, 633 A.2d 514 (1993) (finding discovery rule applicable where plaintiff was aware that she had suffered injury and that medication was the likely cause of the injury, but the record did not reveal that she was or should have been aware that a lack of care in administering the medication was also a cause of her condition).

Here again, the standard is not whether a particular defendant's potential involvement in causing plaintiff's injuries was certain, provable, or even probable, but rather whether plaintiff knew or reasonably should have been aware that such third-parties were potentially at fault for his injuries. *Martinez,* 163 N.J. at 55, 747 A.2d 266 ("where a plaintiff knows of an injury, *but fault is not self-evident or implicit in the injury itself,* it must be shown that a *reasonable person would have been aware of such fault* in order to bar the plaintiff from invoking the discovery rule.") As the New Jersey Supreme Court has explained, "[k]nowledge of fault for purposes of the discovery rule has a circumscribed meaning: it requires only the awareness of facts that would alert a reasonable person exercising ordinary diligence that a third party's conduct may have caused or contributed to the cause of the injury and that conduct itself might possibly have been unreasonable or lacking in due care." *Savage,* 134 N.J. at 248, 633 A.2d 514 (1993). Cases in which the Court has held that the statute of limitations did not begin to run against a particular individual or entity within the limited universe

of potential defendants, notwithstanding the plaintiff's discovery of his injury and awareness that it had been "due to the fault of another," generally involve a unique set of circumstances which permit the conclusion that plaintiff had no reason to believe that her injuries were potentially due to the negligent conduct of a third party. The majority of these cases involve issues of complex medical causation where the prospect that the conduct of other third parties may have caused or contributed to the plaintiff's injuries was not self-evident or implicit in the nature of the injury itself. *See, e.g., Mancuso,* 163 N.J. 26, 747 A.2d 255 (permitting breast cancer patient to invoke discovery rule to ˙bring claim against radiologist more than two years after his alleged malpractice in allegedly misinterpreting the patient's first two mammograms where patient "did not suspect, much less have reason to believe" that she might have been injured by radiologist's conduct until receipt of information through a deposition in connection with related malpractice claim against surgeon for failure to follow up); *Gallagher v. Burdette–Tomlin Memorial Hospital,* 163 N.J. 38, 747 A.2d 262 (2000) (applying discovery rule to patient's medical malpractice claim against after-care urologists for negligent treatment of infection where patient had "no reasonable basis to suspect that her crippling condition was caused by anything other than the original surgery"). Moreover, in many of these cases, prospective litigants were misled, either intentionally or inadvertently, by the false assurances of a physician or expert that a third party's conduct had not caused or contributed to their injuries. *See, e.g., Caravaggio,* 166 N.J. at 251, 765 A.2d 182 (finding delay in bringing malpractice claim against orthopedic surgeon was justified where patient reasonably relied on the surgeon's statements placing blame for post-surgery complications with defective rod); *Martinez,* 163 N.J. 45, 57, 747 A.2d 266 (finding

that physician's assurances that the hospital emergency room staff "did all they could" to treat victim of a severe beating "would tend to deflect an ordinary person's attention from the hospital's conduct"); *Cf., Abboud v. Viscomi,* 111 N.J. 56, 65, 543 A.2d 29 (1988) (noting that dentists' repeated assurances that plaintiff's post-extraction pain was normal contributed to delay in discovering permanent nerve damage); *Lynch v. Rubacky,* 85 N.J. 65, 74–76, 424 A.2d 1169 (1981) (observing that doctor's repeated assurances that plaintiff's condition was result of normal "healing process" impeded plaintiff from discovering doctor's negligence). In other words, each of the cases in this sub-category of discovery rule decisions presented equitable considerations justifying a prospective litigant's delay in bringing a claim against additional third parties.

No such equitable considerations exist here. A reasonable person in Plaintiff's position, having discovered a possible causal connection between his injuries and his bicycle seat, should have been aware that other business entities involved in the manufacture, design, assembly, and distribution of the bicycle seat may have been responsible for his injuries. Indeed, the potential liability of those business entities involved in the chain of production was arguably implicit in the nature of the injury itself. Plaintiff points to no evidence that Trek made any representations or assurances which may have misled Plaintiff by, for instance, suggesting that it had been solely responsible for the design, manufacture, assembly, and distribution of the allegedly defective bicycle seat.

██ That Plaintiff may not have known the specific identities of these business entities is of no consequence. A plaintiff's duty to exercise ordinary or reasonable diligence in pursuing a products liability cause of action includes the responsibility to undertake steps to ascertain the specific

identity of those business entities included in the limited universe of potential defendants responsible for creating and distributing the allegedly defective product. In this situation, Plaintiff was aware or reasonably should have been aware of facts suggesting that he had been injured, that his original bicycle seat was the source of his injury, and that those business entities involved in the production and distribution of this allegedly defective product were potentially responsible for his injuries. However, Plaintiff neglected to invoke the fictitious party rule to preserve claims against those other unidentified entities. *See Knauf v. Elias*, 327 N.J.Super. 119, 127, 742 A.2d 980 (App.Div.1999) ("Failure to utilize the fictitious party rule may result in plaintiff's action being barred if an unknown defendant, later identified, is sued after the statute of limitations has run.").

The Court's conclusion would not impose an unnecessarily rigid or harsh application of the discovery rule or ignore the equitable considerations underlying its application. Upon discovering that the allegedly defective bicycle seat may have caused or contributed to his injuries, Plaintiff still had two years within which to investigate the possibility that other, yet unidentified, business entities involved in the manufacture, design, assembly, distribution, or sale of the allegedly defective product may similarly be responsible or liable for such harm. As it is, Plaintiff did not amend his complaint to include claims against Defendants Selle Italia and Vetta USA until over a year and a half after filing his original complaint against Trek, but offers no offers no explanation for this extended delay. Plaintiff does not maintain, for instance, that he undertook a diligent inquiry to determine whether other business entities had participated in the manufacture and distribution of the product, but was reasonably unable to obtain such information through discovery. Had Plaintiff uncovered information suggesting the potential liability of other unidentified business entities at any time during the discovery process, Plaintiff could have invoked the fictitious party rule to preserve potential claims against these additional defendants while continuing to diligently pursue their true identities. Instead, the procedural history of the case suggests that Plaintiff's Amended Complaint was merely a belated response to Trek's efforts to pull additional party defendants into the litigation.

The Court therefore concludes, based on the undisputed facts in the record, that Plaintiff either knew or should have been aware of facts suggesting a possible causal connection between the bicycle seat and his impotency and that other business entities involved in the seat's manufacture and distribution may have caused or substantially contributed to his injuries more than two years prior to the filing of Plaintiff's Second Amended Complaint. Plaintiff is therefore barred, as a matter of law, from asserting his negligence and strict products liability claims against Defendants Selle Italia and Vetta USA.[11] Accordingly,

---

11. The Court observes that, based on the forgoing analysis, Plaintiff's negligence and strict liability claims against Defendants Selle Italia and Vetta USA would similarly be barred under Connecticut's statutes of limitations for such claims. Connecticut's relevant statute of limitations provides in relevant part that "no product liability claim ... shall be brought but within three years from the date when the ... injury is first sustained or in the exercise of reasonable care should have been discovered ..." C.G.S.A. § 52–577a(a). Although Connecticut's Supreme Court has not had occasion to construe the "discovery" language of Section 52–557a(a), the language used is identical to the discovery language of the state's two-year statute of limitations for claims sounding in negligence, *see* C.G.S.A. § 52–584, which the Court has had occasion to interpret. The Connecticut Supreme

the Court will grant Defendants Selle Italia and Vetta USA's respective motions for summary judgment on Counts I (negligence) and III (strict products liability) of Plaintiff's Amended Complaint.[12]

## IV.

▮▮▮▮▮▮ In order to sustain his products liability claim, Plaintiff must prove that the alleged offending product is defective and that the defect was the proximate cause of his injuries. *Campos v. Firestone Tire and Rubber Co.*, 98 N.J. 198, 485 A.2d 305 (1984); *Battistoni v. Weatherking Products, Inc.*, 41 Conn.App. 555, 562, 676 A.2d 890 (1996).[13] The thrust of Plaintiff's products liability claim is that the allegedly offending bicycle seat was defective in that it was unaccompanied by warnings cautioning users about the product's alleged propensity to cause erectile dysfunction in male riders. *See Zaza v. Marquess and Nell, Inc.*, 144 N.J. 34, 57, 675 A.2d 620 (1996) ("A failure to warn, or failure to warn adequately, [about the hidden or latent dangers attendant to the foreseeable use of a product] may constitute a defect in a product sufficient to support a cause of action in strict liability"); *Tomer v. American Home Products Corp.*, 170 Conn. 681, 689, 368 A.2d 35 (1976) ("[a] product may be defective because a manufacturer or seller failed to warn of the product's unreasonably dangerous propensities"). In a "failure-to-warn" products liability action, the "defect" is not a flaw in the product's manufacture or structural design, rather the defective feature or attribute of the product is the absence of an adequate warning to unsuspecting users with respect to the dangers associated with the intended or foreseeable use of the product. *See Coffman v. Keene Corporation*, 133 N.J. 581, 594, 628 A.2d 710 (1993) (citing *Freund v. Cellofilm Properties, Inc.*, 87 N.J. 229, 242, 432 A.2d 925 (1981)) (noting that manufacturer may not have met duty to warn "even if the product is perfectly inspected, designed, and manufactured."); *Giglio v. Connecticut Light & Power Co.*, 180 Conn. 230, 236, 429 A.2d 486 (1980) (noting that where "a manufac-

Court, in interpreting that statute, has noted that the statute of limitations will begin to run when a party discovers or in the exercise of reasonable should have discovered that he has suffered "some form of *actionable harm*." *Burns v. Hartford Hospital*, 192 Conn. 451, 472 A.2d 1257 (1984). In the context of a products liability cause of action, a party has sustained the type of "actionable harm" contemplated by the statute when a party is aware or reasonably should have been aware of a possible causal nexus between his injuries and the offending product. *Cf. Peerless Insurance Company v. Tucciarone*, 48 Conn. App. 160, 165, 708 A.2d 611 (1998). Because the Court concludes that Plaintiff became aware of a possible causal connection between his impotence and the allegedly defective bicycle seat more than three years prior to the filing of his Amended Complaint, Plaintiff's negligence and strict products liability claims against Defendants Selle Italia and Vetta USA would likewise be barred under the applicable Connecticut statute of limitations.

**12.** Defendant Vetta USA also moves for summary judgment with respect to Count I (negligence) and Count III (strict products liability) of Plaintiff's Amended Complaint on the grounds that no genuine issue of dispute exists with regard to the company's lack of direct involvement in the manufacture, distribution, or sale of the allegedly defective bicycle seat. Because the Court concludes that Plaintiff is statutorily barred from asserting these claims against Vetta USA, the Court need not reach this issue.

**13.** Neither side has suggested that Connecticut and New Jersey law differ with respect to the basic elements and proof required in a failure-to-warn products liability action in a manner which will affect the Court's disposition of the instant motion. Therefore, for purposes of this motion, the Court will postpone its determination of which substantive law governs Plaintiff's cause of action until the parties have had an opportunity to fully brief the issue.

turer or seller failed to warn of [a] product's unreasonably dangerous propensities ... the failure to warn, *by itself,* constitutes a defect"). Accordingly, a product which is perfectly designed and manufactured may nevertheless be not reasonably fit, suitable or safe for its intended or foreseeable uses if it is not accompanied by adequate warnings or instructions on its safe use. *See Reiff v. Convergent Techs.,* 957 F.Supp. 573, 578 (D.N.J.1997) (Irenas, J.) (citing *Suter v. San Angelo Foundry & Mach. Co.,* 81 N.J. 150, 406 A.2d 140 (1979)).

For purposes of this motion, Defendants Trek and Selle Italia contend that the proffered testimony of Plaintiff's two expert witnesses is inadmissible under Federal Rule of Evidence 702 and that, without such testimony, Plaintiff has failed, as a matter of law, to adduce sufficient proof to demonstrate a causal link between the allegedly offending bicycle seat and his injuries or that there is a danger associated with use of the bicycle seat about which Defendants had a duty to warn. Because the Court concludes that the proffered testimony satisfies Rule 702's evidentiary standard of reliability and because material issues of fact exist with respect to whether such testimony establishes that the allegedly offending product presented a dangerous propensity which caused Plaintiff's injuries and about which Defendants' failed to properly warn, the Court will deny Defendants' motion for summary judgment.

As recently amended, Federal Rule of Evidence 702, which governs the admission of expert testimony in federal court, provides as follows:

If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

 The admissibility of expert testimony under the standard set forth in Rule 702 is a question of law for the district court. When faced with a proffer of expert scientific testimony, the trial judge must make a preliminary determination, pursuant to Rule 104(a), whether the expert testimony satisfies the standard of "evidentiary reliability" established by the rule and will assist the trier of fact to understand or determine a fact in issue. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Proper exercise of this "gatekeeping" role, as it has been further clarified by subsequent decisions of the Third Circuit Court of Appeals, entails the consideration of three basic requirements: (1) qualifications—whether the expert is qualified to speak with authority on a particular subject or issue; (2) reliability—whether the expert's methodology is sound and whether his or her opinion is supported by "good grounds;" and (3) fit—whether there is a relevant "connection between the scientific research or test result to be presented and particular disputed factual issues in the case." *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 741–743 (3d Cir.1994) (*"Paoli II "*) (citations omitted); *see also, Oddi v. Ford Motor Co.,* 234 F.3d 136, 144–46 (3d Cir.2000).

The first step in the Rule 702 inquiry directs the courts attention to whether the proposed expert witness has sufficient knowledge, skill, training, education, or experience to testify with authority on the particular subject matter or issue on which he or she proposes to opine. *Paoli II,* 35

F.3d at 741. The Third Circuit has "held that a broad range of knowledge, skills, and training" will qualify a witness as an expert and has, therefore, expressly "eschewed imposing overly rigorous requirements of expertise and [has] been satisfied with more general qualifications." *Id.* As such, the qualifications requirement has generally been liberally construed by courts in this district. *Id.; Holbrook v. Lykes Bros. Steamship Co., Inc.,* 80 F.3d 777, 781 (3d Cir.1996); *Hammond v. International Harvester Co.,* 691 F.2d 646, 653 (3d Cir.1982). Exclusion is, therefore, "improper simply because an expert does not have the most appropriate degree or training." *Diaz v. Johnson Matthey, Inc.,* 893 F.Supp. 358, 372 (D.N.J.1995) (Irenas, J.).

■ The linchpin of the *Daubert/Paoli* analysis is an evaluation of the "relevance and reliability" of the proposed expert testimony. *See Daubert,* 509 U.S. at 595, 113 S.Ct. 2786. The inquiry into reliability requires a court to ensure that an expert's opinion is "based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" *Paoli II,* 35 F.3d at 742 (citing *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786). In other words, the court must satisfy itself that the expert has "good grounds" for his or her opinion. *Id.* The Supreme Court, and the Third Circuit, have identified several factors to assist the court in determining whether a particular expert opinion is based on valid reasoning or methodology. These factors include: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. *Paoli II,* 35 F.3d at 742 n. 8. These factors are intended to serve only as "useful guideposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted." *Heller v. Shaw Industries, Inc.,* 167 F.3d 146, 152 (3d Cir.1999); *see also, Daubert,* 509 U.S. at 594, 113 S.Ct. 2786 (emphasizing that the inquiry into the evidentiary reliability of expert testimony under Rule 702 is intended to be a "a flexible one" and that the list of enumerated factors is neither exclusive nor dispositive).

Generally speaking, the court's evaluation of the reliability of an expert's testimony will focus "solely on the principles and methodology [on which the expert relies], not on the conclusions which they generate." *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786. However, "conclusions and methodology are not entirely distinct from one another" and "nothing in *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Electric Co. v. Joiner,* 522 U.S. 136, 145–146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Accordingly, when making a preliminary determination with respect to the admissibility of expert testimony, a court must engage in limited review of an expert's conclusions "in order to determine whether they could reliably flow from the facts known to the expert and the methodology used." *Heller,* 167 F.3d at 153 (3d Cir. 1999). A court may conclude, after viewing an expert's conclusions in light of the evidence on which he relies and the methodology employed, that "there is simply too great an analytical gap between the data and the opinion proffered." *Joiner,* 522 U.S. at 145–146, 118 S.Ct. 512.

Rule 702's final requirement is that proffered expert testimony must "fit" within the facts of the case. " 'Fit' requires that the proffered testimony must in fact assist the jury, by providing it with relevant information, necessary to a reasoned decision of the case." *Magistrini*, 180 F.Supp.2d at 595; *see, e.g., Habecker v. Clark Equipment Co.*, 36 F.3d 278, 290 (3d Cir.1994) (holding that an accident simulation failed to satisfy the "fit" requirement because the conditions of the simulation were far different from those existing at the time of the accident), *cert. denied*, 514 U.S. 1003, 115 S.Ct. 1313, 131 L.Ed.2d 195 (1995). Whether expert testimony satisfies this requirement depends upon "the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case." *Paoli II*, 35 F.3d at 743.

■■■ In exercising its gatekeeping role under Rule 702, this court is mindful of the limited nature of its task and of the need to avoid confusing determinations of admissibility with issues pertaining to the credibility or weight of an expert's conclusions. *See Kannankeril*, 128 F.3d at 809 (emphasizing that district court's should take care not to "mistake credibility questions for admissibility questions"). Generally speaking, the Federal Rules of Civil procedure "embody a strong and undeniable preference for admitting any evidence which has the potential for assisting the trier of fact." *Id.* at 806. As the Supreme Court observed in *Daubert*, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence" *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786; *see also, Paoli II*, 35 F.3d at 750 n. 21. A district court's gatekeeping role under Rule 702 should be exercised consistent with this "liberal policy of admissibility." *Id.; Holbrook v. Lykes*

*Bros. Steamship Co., Inc.*, 80 F.3d 777, 780; *Paoli II*, 35 F.3d at 741. For purposes of this motion, the focus of this Court's inquiry is, therefore, "not whether a particular scientific opinion has the best foundation or whether it is demonstrably correct. Rather the test is whether the 'particular opinion is based on valid reasoning or methodology.' " *Oddi*, 234 F.3d at 145–146 (quoting *Kannankeril*, 128 F.3d at 806). Analysis of the credibility and weight of the expert's conclusions themselves, as distinguished from the reasoning or methodology employed and facts relied on, is reserved for the trier of fact after the testimony has been subjected to the rigors of cross-examination. *Kannankeril*, 128 F.3d at 802. With these fundamental principles as a guide, the Court turns to evaluate Defendants' challenges to the admissibility of the proposed testimony of Plaintiff's two expert witnesses.

A.

■■■ Plaintiff seeks to admit the expert testimony of Dr. Robert Kessler, M.D., a physician and professor of urology at the Stanford University Medical Center, for the purpose of establishing specific medical causation—that is, to establish, to a reasonable degree of medical certainty a direct causal link between the bicycle seat and Plaintiff's impotence. Employing the technique commonly known as "differential diagnosis," Dr. Kessler reviewed Plaintiff's family and personal medical history, occupational background, the results of physical examinations, the reports of Plaintiff's treating physicians regarding the treatment of his erectile dysfunction, and postoperative evaluations, and concluded, to reasonable degree of medical certainty, that Plaintiff's impotency was caused by the persistent pressure exerted by his bicycle seat. Specifically, Dr. Kessler opines that prolonged periods of persistent pressure from the bicycle seat caused enduring

damage to Plaintiff's perineal arteries, restricting the flow of oxygen-carrying blood to Plaintiff's genitals, and preventing Plaintiff from achieving and maintaining an erection.

Defendants argue that Dr. Kessler's testimony should be excluded on the grounds that: (1) his "differential diagnosis" fails to adequately rule out alternative possible causes for Plaintiff's impotency; and (2) his conclusion with respect to the specific medical cause of Plaintiff's impotency is unsupported by published, peer-reviewed studies suggesting a causal link between conventional bicycle seats and erectile dysfunction. The Court concludes, however, that the methodology employed by Dr. Kessler in diagnosing the cause of Plaintiff's impotency is sufficiently reliable, and that the absence of any reference to specific, published studies confirming a general causal link between bicycle riding and impotency is, under the circumstances, an insufficient basis for excluding expert testimony which is otherwise based on a reliable methodology. Accordingly, the Court will deny Defendants motion to exclude Kessler's expert testimony.

Differential diagnosis, or differential etiology, is a methodology or technique commonly used by urologists and other medical professionals in diagnosing an illness or medical condition and determining its cause. A reliable differential diagnosis is typically "performed after 'physical examinations, the taking of medical histories, and the review of clinical tests,' and generally is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching the one that cannot be ruled out, or determining which of those that cannot be excluded is the most likely." *Magistrini v. One Hour Martinizing Dry Cleaning,* 180 F.Supp.2d 584, 609 (D.N.J.2002) (Hochberg, J.) (quoting *Kannankeril,* 128 F.3d at 807); *see also,*

*Paoli II,* 35 F.3d at 758 ("Differential diagnosis can be considered to involve the testing of a falsifiable hypothesis ... through an attempt to rule out alternative possible causes"). As the Third Circuit has observed, a differential diagnosis, when properly performed, exhibits many of the indicia of reliability identified in *Daubert* and *Paoli II,* in that it generally involves the "testing of a falsifiable hypothesis," enjoys "widespread acceptance in the medical community," has been "subject to peer review," and, when properly applied, "does not frequently lead to incorrect results." *See Paoli II* at 758.

When offered for the purpose of proving specific medical causation, a meaningful or reliable differential diagnosis must specifically negate other alternative possible causes. *See Turbe v. Robert A. Lynch Trucking, Inc.,* 1999 WL 1087026 (Terr.V.I.1999), ("At the core of a differential diagnosis is a requirement that experts rule out obvious alternative causes"). The district court has the discretion to exclude as "unreliable" a medical expert's opinion as to the specific source or cause of a plaintiff's medical condition where "(1) the [physician] engaged in very few standard diagnosis techniques by which doctors normally rule out alternative causes and (2) the defendant pointed to some likely cause of the plaintiff's illness other than the defendant['s] actions and [the physician] offered no reasonable explanation as to why he or she still believed that the defendant['s] actions were a substantial factor in bringing about that illness." *Id.* at 760; *Magistrini,* 180 F.Supp.2d at 609 ("While an expert is not required to rule out all alternative possible causes of a plaintiff's disease, 'where a defendant points to a plausible alternative cause and the doctor offers no reasonable explanation' for why he still concludes that the chemical was a substantial factor in bringing about the

plaintiff's disease, 'that doctor's methodology is unreliable' "); *Diaz*, 893 F.Supp. at 376 (excluding expert medical testimony on issue of specific causation where physician "did little, if anything, to rule out alternative causes" and either "ignored" or offered "no satisfactory reason" for discounting "several alternative possible causes" for plaintiff's asthma identified by defendant).

 However, "a medical expert's causation conclusion should not be excluded merely because he or she failed to rule out every possible alternative cause of a plaintiff's illness." *Heller*, 167 F.3d at 156 (concluding that district court erred insofar as it "required [medical expert] to 'rule out all alternative possible causes' "); *Paoli II*, 35 F.3d at 761; Daniel J. Capra, *The Daubert Puzzle*, 32 Ga.L.Rev. 699, 728 (1998) ("Obvious alternative causes need to be ruled out. All possible causes, however, cannot be and need not be eliminated before an expert's testimony will be admitted."). Moreover, "a physician need not conduct every possible test to rule out all possible causes of a patient's illness, 'so long as he or she employed sufficient diagnostic techniques to have good grounds for his or her conclusion.' " *Heller*, 167 F.3d at 156. Where a physician has ruled out the most obvious alternative causes and offered a reasonable explanation for dismissing or discounting alternative possible causes identified by the defendant, the testimony should be admitted and questions regarding the credibility, accuracy, and weight of the testimony should be reserved for determination by the trier of fact. *See Heller*, 167 F.3d at 157 (citing *Kannankeril*, 128 F.3d at 808) ("[A] defendant suggested alternative causes (once adequately addressed by the plaintiff's expert) affect the weight that the jury should give the expert's testimony and not the admissibility of that testimony.").

The Court concludes that Dr. Kessler's differential diagnosis is sufficiently reliable to satisfy Rule 702's standard of admissibility. Based on a review of Plaintiff's medical records, Dr. Kessler was able to specifically rule out a number of alternative possible causes for Plaintiff's impotency. (See Certification of Dr. Robert Kessler, M.D., attached as Ex. N to Pl.'s Opp. Br.). For instance, he observed that Plaintiff did not suffer from diabetes, neurological disease, or high blood pressure, medical conditions commonly associated with impotency in young males. (Kessler Dep. at ¶ 51–52). Dr. Kessler also offers reasoned explanations for dismissing or discounting additional factors suggested by Defendants. For instance, he notes that any possibility that Plaintiff's erectile difficulties could be explained by psychological factors alone is belied by the results of the arteriogram which revealed actual physical damage to Plaintiff's perineal arteries and the apparent success which vascular surgery had in resolving Plaintiff's erectile dysfunction. (See Cert. of Dr. Kessler, Pl.'s Opp. Br., Ex. N; Kessler Dep. at ¶ 89–90). Cigarette smoking and obesity, he observes, while perhaps increasing the incident of impotency among persons suffering from other serious health problems, cannot explain Plaintiff's persistent impotency in light of Plaintiff's age, body weight, and the relative infrequency with which he smokes tabacco. (Kessler Dep. at ¶ 53–54; 82–83). Dr. Kessler concedes that he cannot conclusively rule out the possibility that the damage to Plaintiff's arteries was the result of a combination of acute and chronic injuries; however, he notes that the pattern of damage displayed by the angiogram is more indicative of chronic pressure than of a single incident of blunt force trauma. (Kessler Dep. at ¶ 68–69). Dr. Kessler's testimony is further supported by the relatively strong temporal relationship between Plaintiff's

use of the bicycle seat and the onset of his physical symptoms of impotency. This is the type of temporal relationship that might reliably support a conclusion that frequent and persistent pressure from the bicycle seat was the cause of Plaintiff's impotency.

■ Defendants further contend that Dr. Kessler's testimony should be excluded because the medical studies and articles which he references do not establish a general causal link between bicycle riding and impotence. However, as the Third Circuit has recently observed, neither *Daubert* nor *Paoli* necessarily require that a physician "always cite published studies on general causation in order to reliably conclude that a particular object caused a particular illness." *Heller,* 167 F.3d at 155 (citing for support, *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1043 (2d Cir. 1995) (affirming admission of treating doctor's testimony despite the fact that he "could not point to a single piece of medical literature that says glue fumes cause throat polyps")). "To so hold," the Third Circuit noted in *Heller,* "would doom from the outset all cases in which the state of research on the specific ailment or causal agent was in its early stages, and would effectively resurrect a *Frye*-like bright-line standard, not by requiring that a methodology be 'generally accepted,' but by excluding expert testimony not backed by published (and presumably peer-reviewed studies)." *Heller,* 167 F.3d at 155. Exclusion of an otherwise reliable differential diagnosis on this basis alone is particularly inappropriate where, as here, there exists a "strong temporal relationship" between the Plaintiff's use of the offending product and the onset of his symptoms or medical condition. *Id.* at 154 ("Assuming that [plaintiff's medical] expert conducted a thorough differential diagnosis and had thereby ruled out other possible causes of [plaintiff's] illness, and assuming he had relied on a valid and strong temporal rela-

tionship between the installation of the carpet and [plaintiff's medical] problems, we do not believe that this would be an insufficiently valid methodology for his reliably concluding that the carpet caused [plaintiff's] problems."). Accordingly, the Court concludes that Dr. Kessler's failure to explicitly rely on definitive, published studies supporting a general causal link between bicycle riding ˙ and erectile dysfunction is insufficient grounds to exclude his testimony which is otherwise based on a reliable differential diagnosis and reliably flows from the underlying facts of the case. Defendants' motion to exclude the expert testimony of Dr. Kessler will, therefore, be denied.

B.

■ ·Plaintiff seeks to introduce the testimony of Dr. Steven Batterman, PhD., a consultant on forensic engineering, accident reconstruction, and biomechanics, for the purpose of establishing general causation—that is on the issue of whether, by virtue of its design, the bicycle seat utilized by Plaintiff while a member of the Willamantic police department's bike patrol unit presented a dangerous condition capable of causing erectile difficulties in male riders. According to his curriculum vitae, Dr. Batterman served for 33 years as a member of the University of Pennsylvania's faculty as a professor of bioengineering and applied mechanics, teaching courses and supervising dissertations on topics including mechanical and structural design, biomechanics, and safety engineering. For approximately 25 of those years, Dr. Batterman held a joint appointment as a professor in the Department of Orthopaedic Surgery at the University's School of Medicine where he supervised various research projects in the area of biomechanics and taught a course to orthopaedic residents about the biomechanics of the musculoskeletal system.

The principal focus of Dr. Batterman's preliminary report is on the "elements of the biomechanics of bicycle riding in relation to the manner in which people sit on standard or conventional bicycle seats," like the Trek seat which is the subject of this litigation. (Selle Italia's Br. in Supp. of Mot. for Sum. Judg. at Ex. F). Dr. Batterman opines that, regardless of the specific design of a particular bicycle's frame, the design of a conventional bicycle seat concentrates pressure on the perineum, thereby compressing the perineal arteries and obstructing the flow of blood to the penis. (*Id.*). Persistent and frequent pressure from such seats may, over time, result in the more permanent compression of these arteries, causing some male riders to experience difficulty obtaining and maintaining an erection. (*Id.*) Dr. Batterman's conclusions are based, *inter alia*, on an inspection of the bicycle seat itself and a review of various documents, including a laser copy of a photograph of the subject bicycle, owner's manuals and brochures for Mongoose bicycles like that used by the Plaintiff, Plaintiff's medical records, and Dr. Kessler's preliminary report. (*Id.*).

Defendants contend is that Dr. Batterman's proposed expert testimony on the issue of general causation fails to satisfy Rule 702's threshold standard of admissibility because: (1) Dr. Batterman is not qualified to offer testimony regarding "human anatomy and the medical affect that bicycle riding has on specific portions of the body"; (2) Dr. Batterman's opinion is based on an invalid and unreliable methodology; and (3) the articles referenced in Dr. Batterman's preliminary report do not support his conclusions with respect to the general causal link between conventional bicycle seats and erectile dysfunction. The Court rejects each of these asserted basis for excluding Dr. Batterman's testimony and will, therefore, deny Defendants' motion.

In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court's clarified that a district court's role as "gatekeeper" under Rule 702 extends not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized knowledge." *Id.* at 141, 119 S.Ct. 1167. As the Court acknowledged, however, the application of Daubert to more technical fields of expertise necessarily require a more flexible analysis. As this Court has recently observed, "unlike laboratory or medical testing, which employ rigorous and replicable protocols, technical fields such as engineering often involve more idiosyncratic methods of design and testing." *Milanowicz v. The Raymond Corp.*, 148 F.Supp.2d 525, 532 (D.N.J.2001) (Irenas, J.). When evaluating the reliability of the reasoning and methodology employed by nonscientific or technical expert witnesses, the court's main objective is to "ensure that an expert, whether basing testimony on professional studies, a clearly established methodology or technique, or on his own specialized knowledge, skill or experience, employs in the courtroom the same level of intellectual rigor that characterize the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152, 119 S.Ct. 1167.

Acknowledging the need for "flexibility" in applying the *Daubert's* gatekeeping requirement to technical or nonscientific testimony, the Supreme Court in *Kumho* emphasized "that the law grants the district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142, 119 S.Ct. 1167. While a "trial court *may* consider one or more of the more specific factors that *Daubert* mentioned," *id.* at 141, 119 S.Ct. 1167, those factors, the Court observed, "may or may not be pertinent in assessing reliability, depending on the nature of the

issue, the expert's particular expertise, and the subject of his testimony." *Id.* at 150, 119 S.Ct. 1167.

 This Court need not devote much time to Defendants' first argument. In light of the liberality with which the Third Circuit has applied the qualifications prong of the *Daubert/Paoli* analysis, the Court is satisfied that Dr. Batterman's 25 years as a professor of biomechanics at the University of Pennsylvania's medical school more than qualify him to offer his opinion with respect to the affect of the bicycle seat on specific portions of the male anatomy. An expert need not have a medical degree in order to reliably testify about relatively uncomplicated aspects of human anatomy. *See Diaz,* 893 F.Supp. at 372 (noting that the exclusion of expert testimony "is improper simply because an expert does not have the most appropriate degree or training"). Moreover, Dr. Batterman expressly limits the scope of his testimony to the manner in which the design of conventional bicycle seats could potentially lead to erectile difficulties in male riders and does not offer any clinical or medical opinions with respect to the specific medical cause or source of Plaintiff's impotency. (Selle Italia Br. in Supp. of Mot. for Sum. Judg. at Ex. F).

Defendants' primary contention is that Dr. Batterman's testimony should be excluded because he fails to employ a reliable methodology and does not support his conclusions with specific references to peer reviewed articles or studies establishing a link between bicycle seats and erectile dysfunction. The Court rejects both these arguments, however. As the Court acknowledged in *Kumho,* in some circumstances, an expert opinion based exclusively on a "visual or tactile inspection" or "skill or experienced-based observation" may, depending on "the nature of the issue [in dispute], the expert's particular expertise, and the subject of his testimony," satisfy Rule 702's threshold of evidentiary reliability. *Id.* at 150, 119 S.Ct. 1167; *see, e.g., United States v. McPhilomy,* 270 F.3d 1302, 1313 (10th Cir.2001) (holding that Bureau of Land Management employee with an advanced degree in geology and experience in evaluating mineral materials who had "personally inspected" a sample of stone and observed its physical properties could reliably offer expert testimony with respect to the quality of the stone). Under the circumstances, Dr. Batterman's reliance on visual or tactile inspection and his own specialized expertise is sufficiently reliable in light of the nature of the issue on which he proposes to opine, the relatively narrow scope of his testimony, and his particular field of expertise. The specific issue about which Dr. Batterman proposes to testify is rather a narrow one— specifically, whether, notwithstanding the availability of alternative designs or the seats conformity with industry standards, the design of the bicycle seat which is the subject of this litigation presents a potential risk of arterial damage and impotency in male riders about which Defendants failed to properly warn. Moreover, as previously noted, Dr. Batterman does not purport to offer testimony regarding the specific medical causation of the Plaintiff's impotence.[14] Finally, Defendants have not suggested that visual or tactile inspection would be considered an unreliable methodology by other experts qualified in the field of engineering and biomechanics or that such experts would require additional testing before reaching conclusions with respect to the manner in which the seat

---

**14.** The Court agrees with Defendants that insofar as Dr. Batterman proposes to testify regarding the specific medical causation of Plaintiff's impotence, he lacks sufficient qualifications to testify with authority on this subject and has not employed a methodology on which he could reliably base such conclusions.

exerts pressure on male riders and the potential affects of such pressure. The Court is, therefore, satisfied that, under the circumstances, Dr. Batterman's reliance on his own expertise and a visual inspection of the allegedly offending bicycle seat is sufficiently reliable to meet the standard of admissibility under Rule 702. The Court is also unpersuaded that the absence of peer-reviewed articles or studies definitively establishing a link between conventional bicycle seats and impotency warrants the exclusion of testimony that is otherwise reliable and relevant.

■ Accordingly, the Court concludes, for purposes of this motion, that the testimony of Plaintiff's two expert witnesses is admissible under Rule 702. In light of this testimony, material issues of fact exist with respect to whether such testimony establishes that the allegedly offending product presented a dangerous propensity which caused Plaintiff's injuries and about which Defendants failed to properly warn which preclude entry of summary judgment in favor of Defendants. Defendants motion for summary judgment will, therefore, be denied.

## V.

■ Defendant Trek also seeks summary judgment on its third party claim for common law indemnification against co-defendant Selle Italia, which is contained in Count II of Trek's Third Party Complaint. At the outset, the Court notes that there is a dispute between the parties with respect to whether New Jersey or Connecticut law governs the resolution of this specific issue. However, because the Court concludes that summary judgment must be denied regardless of which state's law supplies the rule of decision on this issue, the Court need not reach this issue in order to reach a proper disposition of Trek's motion. *See Williams v. Stone*, 109 F.3d 890, 893 (3d Cir.1997) ("Under general conflict of laws

principles, where the laws of the two jurisdictions would produce the same result on the particular issue presented, there is a 'false conflict' and the Court should avoid the choice-of-law question.' "); *see also, Rohm & Haas Co. v. Adco Chem. Co.*, 689 F.2d 424, 429 ("When such a 'false conflict' exists, New Jersey conflicts of law rules permit the resolution of the case without a choice between the laws of the states."). Connecticut law does not recognize a right of common law indemnification between co-defendants in an action sounding in strict products liability. *See Kyrtatas v. Stop & Shop, Inc.*, 205 Conn. 694, 702, 535 A.2d 357. While New Jersey law does recognize that common law indemnification may be appropriate between co-defendants in a products liability action under circumstances where a "distributor" or "retailer" involved in the chain of distribution was merely an "innocent conduit" in the sale of the allegedly defective product, *see, e.g., Promaulayko v. Johns Manville Sales Corp.*, 116 N.J. 505, 562 A.2d 202 (1989) (recognizing a claim for common law indemnification by one distributor against another distributor higher in the chain "neither of which altered or even possessed the product as it proceeded from the producer to the ultimate purchaser"); *Newmark v. Gimbel's Inc.*, 54 N.J. 585, 600–01, 258 A.2d 697 (1969) (recognizing the possibility of a common law indemnification claim by retailer against manufacturer with primary responsibility for the defect), a party may not seek recovery under a theory of common law indemnification where its own active negligence is found to have contributed to the creation of the defect. *See Promaulayko*, 116 N.J. at 511, 562 A.2d 202 ("one who is primarily at fault may not obtain indemnity from another tortfeasor"). Because material issues of fact exist in the record with respect to the nature of the relationship between Trek and Selle Italia and the extent of

Trek's control, if any, over the design, manufacture, and labeling of the allegedly offending bicycle seat, the Court will deny Trek's motion for summary judgment.

## VI.

For the forgoing reasons, the Court will grant summary judgment with respect to Plaintiff's negligence and strict products liability claims against Defendants Vetta USA and Selle Italia on the grounds that such claims are barred by New Jersey's two-year statute of limitations. However, the Court will deny Defendant Trek's motion for summary judgment against Plaintiff's strict products liability claim. The Court will also deny Defendant Trek's motion for summary judgment with respect to its third party claim for common law indemnification against co-defendant Selle Italia. The Court will enter an appropriate order.

## ORDER GRANTING DEFENDANTS VETTA U.S.A., LTD. AND SELLE ITALIA, S.R.L.'S MOTIONS FOR SUMMARY JUDGMENT ON COUNTS I AND III OF PLAINTIFF'S AMENDED COMPLAINT AND DENYING DEFENDANT TREK BICYCLE CORPORATION'S MOTION FOR SUMMARY JUDGMENT ON COUNT I OF PLAINTIFF'S AMENDED COMPLAINT AND COUNT II OF ITS THIRD PARTY COMPLAINT

This matter having appeared before the Court upon Defendants Trek Bicycle Corporation, Vetta U.S.A., Ltd., Selle Italia, S.R.L.'s Motions for Summary Judgment, and the Court having considered the submissions of the parties, for the reasons set forth in an opinion issued by this Court, which findings of fact and conclusions of law are incorporated herein by reference, and for good cause appearing,

**IT IS** on this *25th* day of June, 2002,

**ORDERED THAT:**

1. Defendant Vetta U.S.A., Ltd.'s Motion for Summary Judgment with respect to Count I (negligence) and Count III (strict products liability) of Plaintiff's Amended Complaint is hereby **GRANTED**;

2. Defendant Selle Italia, S.R.L.'s Motion for Summary Judgment with respect to Count I (negligence) and Count III (strict products liability) of Plaintiff's Amended Complaint is hereby **GRANTED**;

3. Defendant Trek Bicycle Corporation's Motion for Summary Judgment with respect to Plaintiff's strict products liability claim, contained in Count III of Plaintiff's Amended Complaint, is hereby **DENIED**.

4. Defendant Trek Bicycle Corporation's Motion for Summary Judgement with respect to its third party claim for common law indemnification against Co-defendant Selle Italia, S.R.L., contained in Count II of Defendant Trek's Third Party Complaint, is hereby **DENIED**.

5. Plaintiff may proceed with his claims for negligence (Count I), breach of express and implied warranty (Count II), and strict products liability (Count III), against Defendant Trek Bicycle Corporation. Plaintiff's claim for breach of implied or express warranty against Defendants Selle Italia, S.R.L., and Vetta USA, Ltd., also remains in the litigation.

6. Defendant Trek Bicycle Corporation may proceed with its third party claims for contribution and indemnification against Co-defendants Selle Italia, S.R.L., contained in Counts I through III of Trek Bicycle Corporation's Third Party Complaint, and Vetta USA, contained in Counts IV through VI of Trek Bicycle Corporation's Third Party Complaint. Defendant Selle Italia, S.R.L., may proceed

with its cross-claims for contribution and indemnification against Co-defendants Trek Bicycle Corporation and Vetta USA. Defendant Vetta USA may proceed with its cross-claims for contribution and indemnification against Co-defendants Trek Bicycle Corporation and Selle Italia, S.R.L.